AMBROSE THOMPSON et al., Appellants, *v.* JOHN B. SIMPSON et al., as Executors, etc., Respondents.

The effect of a request by both parties upon trial of an action for a direction of a verdict in his favor is to clothe the court with the functions of the jury; if the party, whose request is denied, does not thereupon request to go to the jury on the facts, a verdict directed for the other party stands, as would the finding of a jury for the same party in the absence of any direction, and the review, upon appeal to this court, is governed by the same rules as apply in cases of verdicts rendered without direction; all controverted and inferable facts will be deemed conclusively established in favor of the party for whom the verdict was directed.

A general warranty in a deed, not limited by other parts thereof, however it technically operates, is only consistent with an intention of the grantor to convey the whole estate.

The rule that there is no estoppel where an interest passes, does not apply to conveyances intended to pass the whole title, although the grantor had a limited interest which was carried by the conveyance.

The Statute of Frauds is not an obstacle to the enforcement by a court of equity of the doctrine that the owner of land may by his acts preclude himself from asserting his legal title against one who, in reliance thereon, has placed himself in a position where to allow the legal owner of the

land to assert his right would operate as a fraud upon the other party; that court will not permit a statute made for the prevention, to be used as an instrument, of fraud.

*It seems*, a party is concluded from denying his own acts or admissions which were expressly designed to influence the conduct of another, and which did so influence it, where such denial would operate to the injury of the latter.

*It seems* also, an estoppel may arise, although there was no designed fraud on the part of the person sought to be estopped; it may arise also where there is a duty to speak and the party upon whom the duty rests has an opportunity and knowing the circumstances requiring him to speak, keeps silent, and it is not necessary that the duty to speak should rest upon any agreement, or legal obligation; it arises whenever principles of natural justice require the disclosure.

The owner, however, of property, which another has assumed to convey without authority, is not precluded by mere silence from subsequently claiming it. There must have been an occasion and duty to speak, and it must appear that such omission, upon opportunity presented, was intentional, or in negligent disregard of the plain dictates of conscience and justice.

The mere fact that another may act to his prejudice, if the true state of things is not disclosed, does not render silence culpable, or sufficient to estop the true owner; he owes no duty of active diligence to protect the other party from injury. There must be a standing by and encouragement or acquiescence by the true owner in acts inconsistent with his right, knowing that the other party, acting under a false impression, is about to do what will result in his injury.

The doctrine of equitable estoppel, when invoked to bar the legal title to land, should be cautiously applied, and only when the grounds for its application are clearly and satisfactorily established.

Where, however, one without title or authority from the real owner to sell, assumes to sell and convey land in fee, and the owner, knowing the facts, consents to and does accept the proceeds of the sale in full satisfaction of his interest, this operates as a confirmation of the unauthorized sale, and precludes the owner from asserting his legal title.

"Mary E.," the wife of T., died in 1845 seized of certain premises in the city of New York, the title to which vested in her upon the death of E., her mother. The title descended upon the death of "Mary E." to her five infant children, subject to the life estate of her husband, as tenant by the curtesy; he married again, his second wife having the same baptismal name and middle initial as the first, *i. e.*, "Mary E." In 1853 T. and his wife joined in a warranty deed of the premises, her name being given therein as "Mary E." T. represented to the grantees that his wife named in the deed was the sole surviving child of E. and that the property belonged to her, and in the deed the devolution of title

was recited. The grantees purchased in good faith, paying a consideration, which was the full value of the premises. The grantees took possession, built upon and thereafter transferred the property, neither they nor their successors in interest having any knowledge of the fraud or the defect in their title until after the death of T. who died in 1882. In an action of ejectment thereafter brought by the children of the first wife, *held*, that the grantees of T. acquired under their deed only his life estate; that the title of the children was unaffected by the fraud committed by him, and the deed was no obstacle to a recovery by them of their inheritance on the termination of the life estate; also that their right of action did not arise until after the death of their father, and so that the Statute of Limitations was not a bar to the action; that the execution by him of a deed purporting to convey a greater estate than he possessed did not operate as a forfeiture of that estate (1 R. S. 739, § 145), but passed it to the grantees.

The trial court found, upon evidence sufficient to sustain the findings, that the consideration received by T. went into other property which the plaintiffs, with knowledge of the facts, accepted in substitution for their interests. *Held*, that plaintiffs were thereby precluded from asserting their title; that while the death of T. only conveyed his life estate, it purported to convey and it was the intent of the grantors to convey the entire fee, and so, the grantees were entitled to avail themselves of the equities growing out of the disposition of the proceeds.

The provision of the Revised Statutes (1 R. S. 739, § 143), providing that no greater interest shall pass by a grant or conveyance than the grantor himself possessed or could lawfully convey at the time of the delivery of the deed, although it undertakes to convey a larger interest, was simply intended to do away with the common-law doctrine whereby a feoffment by a life tenant or by a person in possession of lands, and other common-law modes of assurance by fine and delivery, had the power of creating an estate in fee, divesting the title of the true owner.

(Argued June 9, 1891; decided October 6, 1891.)

APPEAL from judgment of the General Term of the Supreme Court in the first judicial department, entered upon an order made January 16, 1891, which affirmed a judgment in favor of defendants, entered upon a verdict directed by the court and affirmed an order denying a motion for a new trial.

This was an action of ejectment.

The facts, so far as material, are stated in the opinion.

*James R. Cox* for appellant. By the deed of A. W. Thompson and his wife, Miss Ritchie, in 1853, to Glover, no greater

interest passed than the grantors possessed, *i. e.*, the life estate as tenant by the curtesy. (1 R. S. 739, § 143; *Sparrow* v. *Kingman*, 1 N. Y. 248; *Sage* v. *Cartwright*, 9 id. 50; 5 R. S. 333; 1 id. 674, § 32; *Preston* v. *Smith*, 13 Johns. 407; *Bradstreet* v. *Huntington*, 5 Pet. 402; *Clapp* v. *Bromagham*, 9 Cow. 552; *Varick* v. *Briggs*, 6 Paige, 324; *Spofford* v. *Manning*, 6 id. 383; *Donaldson* v. *Wood*, 22 Wend. 397; *Waller* v. *Harris*, 20 id. 561; *Patterson* v. *Winn*, 11 Wheat. 385; *Rogers* v. *Bradshaw*, 20 Johns. 744; *M'Cartee* v. *Orphan Asylum*, 19 Cow. 507; 1 Kent's Comm. 463; *Rexford* v. *Knight*, 15 Barb. 642.) Neither of the plaintiffs has ever aliened, exchanged or encumbered his estate in 44 Hudson street. (*McCoon* v. *Smith*, 3 Hill, 148; 1 Perry on Trusts, §§ 107, 111; *Chapin* v. *Shafer*, 49 N. Y. 412; *McKean* v. *Boycott*, 2 H. Black. 511; Schouler on Dom. Rel. 533; *U. S.* v. *Bainbridge*, 1 Mason, 82; 2 Kent's Comm. 191, 195; *McGarr* v. *Marshall*, 7 Humph. 121; *Tucker* v. *Moreland*, 10 Pet. 69, 70; *Beardsley* v. *Hotchkiss*, 96 N. Y. 211; *Bergen* v. *Udall*, 31 Barb. 375; *Wood* v. *Robinson*, 22 N. Y. 564; *M. Bank* v. *Atwater*, 2 Paige, 59; 1 Story's Eq. Juris. § 793*d*; *Jeffrey* v. *Jeffrey*, 1 C. & P. 141; *Callaghan* v. *Callaghan*, 8 C. & F. 401; *Dillon* v. *Coppin*, 4 M. & C. 627, 670, 671; Willard's Equity, 263; *Duvoll* v. *Wilson*, 9 Barb. 488.) The defendants can find no defense in the doctrine of latent or implied covenant. (*Mead* v. *Bunn*, 32 N. Y. 278; *D. C. Co.* v. *P. C. Co.*, 8 Wall. 276; *Booth* v. *Cleveland*, 74 N. Y. 15; *Bruce* v. *Fulton Bank*, 79 id. 154; 16 Hun, 615; *Frost* v. *Raymond*, 2 Caines, 188; *Vandekar* v. *Vandekar*, 11 Johns. 122; *Kingman* v. *Sparrow*, 1 N. Y. 257; *Jackson* v. *Hubbell*, 1 Cow. 613; *Jackson* v. *Bradford*, 4 Wend. 622; *Jackson* v. *Waldron*, 13 id. 178; Perry on Trusts, § 270.) There is no evidence of ratification, acceptance, confirmation or adoption by either of the children of these acts of their father. (*Boerum* v. *Schenck*, 41 N. Y. 190; *Cumberland* v. *Sherman*, 30 Barb. 575; Lewin on Trusts, 96, 402; *Nixon* v. *Palmer*, 8 N. Y. 401; Paley Agency, 171; *Owings* v. *Hull*, 9 Pet. 629; *Boyden* v. *Boyden*, 9 Met. 519; *Adair* v. *Trimmer*, 74

N. Y. 554; *Beardsley* v. *Hotchkiss*, 96 id. 211; *Baldwin* v. *Burrows*, 47 id. 211; 2 Greenl. on Ev. § 367; *Wilson* v. *Tuminan*, 6 M. & G. 236; Smith on Cont. 287, 379; 1 Pars. on Cont. 325; *Proctor* v. *Sears*, 4 Allen, 95; *Thrupp* v. *Fielder*, 2 Esp. 628; Schouler on Dom. Rel. 532, 584, 585; *Voorhies' Case*, 24 Barb. 153; *Henry* v. *Root*, 33 N. Y. 536; Bigelow on Fraud, 362, 363; *Fitchett* v. *Adams*, 2 Strangs, 1128; *Goodtitle* v. *Woodward*, 3 B. & A. 424; *Right* v. *Cutthell*, 5 East, 491; *Doe* v. *Walters*, 10 B. & C. 626; *Solomon* v. *Dawes*, 1 Esp. 83–115; *Coles* v. *Bell*, 1 Campb. 478; *Combs* v. *Scott*, 12 Allen, 496; *Fellows* v. *Commissioners*, 36 Barb. 659; *Smith* v. *Kidd*, 68 N. Y. 142; *Bennecke* v. *L. Ins. Co.*, 105 U. S. 361; *Padgett* v. *Lawrence*, 10 Paige, 181; *Jackson* v. *Miller*, 6 Cow. 756; *Walker* v. *Dunspaugh*, 20 N. Y. 170; *Jackson* v. *Sherman*, 6 Johns. 19; *Jackson* v. *Cary*, 16 id. 302; *Jackson* v. *McVey*, 15 id. 234; *Law* v. *Merrills*, 6 Wend. 268; *Garrison* v. *Aiken*, 2 Barb. 25; *Hadden* v. *Silk Co.*, 1 Daly, 388.) There is no element of estoppel in this case. No defendant has ever acted upon anything said or done by plaintiffs. (*Trenton Bank* v. *Duncan*, 86 N. Y. 229, 230; *Lawrence* v. *Brown*, 5 id. 401; *Brown* v. *Bowen*, 30 id. 541; *Favil* v. *Roberts*, 50 id. 225, 581; 2 Pars. on Cont. 793; *Trustees* v. *Smith*, 118 N. Y. 640; *Adair* v. *Lott*, 3 Hill, 186; Willard on Real Estate, 359; *Jackson* v. *Parker*, 3 Johns. Ch. 124; *Jackson* v. *Thompson*, 16 Johns. 293; *Jackson* v. *Norton*, 18 id. 355; Code Civ. Pro. § 415; *Christie* v. *Gage*, 71 N. Y. 189; *Devyr* v. *Shaefer*, 55 id. 446; *Melvin* v. *Locks*, 16 Pick. 137; *Graham* v. *Luddington*, 19 Hun, 246; *Bennett* v. *Garlock*, 79 N. Y. 302; *Learned* v. *Tallmadge*, 26 Barb. 443; *Clute* v. *N. Y. C. & H. R. R. R. Co.*, 120 N. Y. 273; 2 Story's Eq. Juris. §§ 972, 1046; *Acton* v. *Woodgate*, 3 M. & K. 492; *Wallwyn* v. *Coutts*, 3 Meriv. 707; 3 Sim. 14; *Antrobus* v. *Smith*, 12 Ves. 39; *Garrard* v. *Lauderdale*, Id. 1; *Lane* v. *Husband*, 14 Sim. 656; 1 Perry on Trusts, §§ 107, 114; *Dooper* v. *Noelke*, 5 Daly, 413; *Meigs* v. *Meigs*, 15 Hun, 453.) The learned judge at Circuit erred in admitting the evidence of Glover. (*Loeb* v. *Willis*, 100 N. Y. 235; *Capron* v.

*Thompson*, 86 id. 419; *Muldoon* v. *Pitts*, 54 id. 269; *Arthur* v. *Griswold*, 55 id. 400; *Guernsey* v. *Miller*, 80 id. 181; *Eben* v. *Lorillard*, 19 id. 302; *Eriches* v. *DeMill*, 75 id. 374; *Worrall* v. *Parmele*, 1 id. 519; *Shorter* v. *People*, 2 id. 192; *Taylor* v. *Church*, 8 id. 452; *Ashley* v. *Marshall*, 29 id. 494; *Brisbane* v. *Parsons*, 43 id. 200; *Anderson* v. *Rome*, 54 id. 334; *Cole* v. *Raymond*, 9 Gray, 217; 1 R. S. 739, § 143.) The learned judge erred in denying the motion for a new trial. (73 N. Y. 119; 34 id. 301; *Platt* v. *Platt*, 58 N. Y. 647; *McMurray* v. *McMurray*, 66 id. 181; *Miller* v. *Wood*, 116 id. 351.) Subsequently acquired knowledge of the plaintiffs, silence, recognition, even tacit acquiescence, short of the Statute of Limitations, are of no account. (*Tucker* v. *Moreland*, 10 Pet. 78; *Green* v. *Green*, 7 Hun, 492; 69 N. Y. 553; *Jackson* v. *Carpenter*, 11 Johns. 543; *Adair* v. *Brimner*, 74 N. Y. 553, 554.)

*Calvin Frost* and *R. L. Sweezy* for respondents. The children of Mary Evelina Thompson having ratified, confirmed and adopted the deed from Ambrose W. Thompson and wife, to John H. Glover and wife, with full knowledge of all the facts and circumstances attending their father's fraud upon the Glovers, those who are still living, and the other plaintiffs who represent those of the children who have died, are concluded or estopped by such ratification, confirmation and adoption of the deed, and cannot recover possession of the property. (*Maple* v. *Kussart*, 53 Penn. St. 318; *Shoble* v. *Smith*, 8 Watts. 280; *Herques* v. *Marti*, 85 N. Y. 609; *Town* v. *Needham*, 3 Paige, 546; *Wendle* v. *Van Rensselaer*, 1 Johns. Ch. 353; *T. B. Co.* v. *Duncan*, 86 N. Y. 229.) By reason of the acceptance by the children of Mary Evelina Thompson from Ambrose W. Thompson of an equivalent for their property, the title to which he had assumed to convey to the Glovers with covenant of warranty, their estate and interest in the property to which the warranty related became so far vested in their warrantor as to inure by way of estoppel to his grantees. (*House* v. *McCormick*, 57 N. Y. 310; *Taft* v.

*Munson,* Id. 97; *Cole* v. *Raymond,* 9 Gray, 217; *Russ* v. *Alspaugh,* 118 Mass. 378.) Even supposing, that the plaintiffs have a good cause of action herein, the defendants would have recourse against Ambrose W. Thompson or his estate on his warranty, and the latter would be entitled to recover from the plaintiffs the same property which the plaintiffs claim from the defendants, which last recovery would inure to the defendants' benefit. (*Averill* v. *Wilson,* 4 Barb. 187; *Jackson* v. *Bradford,* 4 Wend. 622; *Jackson* v. *Bull,* 1 Johns. Cas. 90.) Plaintiffs seek to avoid the operation of the Statute of Limitations, by alleging the life estate of their father, who did not die until 1882, and the consequent suspension of their right of entry upon the premises in question; to this the defendants answer the forfeiture of the estate of the father of plaintiffs upon the execution of the deed to the Glovers, April 28, 1853. (Code Civ. Pro. § 467; *Ward* v. *Morrow,* 82 N. Y. 265; *Eastman* v. *P. M. R. Assn.,* 65 N. H. 713; *Peters* v. *Bain,* 123 U. S. 696.) The objections made to the testimony of John H. Glover are not sufficient. (*Stevens* v. *Brennan,* 79 N. Y. 254.)

ANDREWS, J. The title to the lot on Hudson street in the city of New York, the subject of this action, vested in 1837, on the death of Evelina Hammond, in her daughter, Mary Evelina Thompson, wife of Ambrose W. Thompson, in fee, and upon her death, in 1845, descended to their five infant children, one son and four daughters, subject to the life estate of her husband, as tenant by the curtesy, who survived her and died in 1882.

Ambrose W. Thompson, in 1847, about two years after the death of his first wife, intermarried with Mary Ewing Ritchie, his second wife, she having the same baptismal name and the same middle initial as the deceased wife, both being by marriage, Mary E. Thompson. This action was brought, in 1887, by the surviving children of Mary Evelina Thompson, and the representatives of the deceased children, against the defendants, to recover possession of the premises under the title

derived from Mary Evelina Thompson.    The defendants claim
title to the lot under a warranty deed executed by Ambrose
W. Thompson (the father) and Mary E. Thompson, his second
wife, to John H. Glover and his wife, Helen L. Glover, in
April, 1853.    The consideration of the conveyance to the
Glovers was $10,000, the full value of the fee, which was paid
by the grantees to Ambrose W. Thompson.    A manifest fraud
was perpetrated on the Glovers by him.    They purchased in
good faith, supposing that Mary E. Thompson, named in the
deed, was the same Mary E. Thompson who, in 1837, had
inherited the lot from her mother, Evelina Hammond.
Ambrose W. Thompson informed them at the time of the pur-
chase that Mary E. Thomson, named in the deed, was the sole
surviving child of Evelina Hammond, and that the property
belonged to his wife, and in the deed the devolution of the
title on Mary Evelina Thompson was recited.

The Glovers took possession under the deed, and in 1857
they erected a new brick building on the lot at an expense of
$16,000, and in 1858 conveyed the lot to one Smith for the
consideration of $28,000, whose executors, in March, 1882,
conveyed it to John B. Simpson, the defendants' testator, for
$32,000, who subsequently thereto, but at what time does not
appear, expended a sum exceeding $3,000 in improvements on
the property.    Neither the Glovers nor any of their grantees
had any notice or suspicion of the fraud of Ambrose W.
Thompson, or of any defect in their title, until about the time
of the commencement of this action.    In 1853, when the deed
to the Glovers was executed, Ambrose Thompson, the eldest
child of Ambrose W. and Mary Evelina Thompson, was an
infant of the age of sixteen years, and the youngest child was
of the age of eight years.    The children then had no knowl-
edge of the deed.

It is evident from these conceded facts that the Glovers
acquired under the deed from Ambrose W. Thompson and his
second wife only the life estate of Ambrose W. Thompson in
the lot in question, and that the title in fee of his children,
subject only to the life estate of the father, was unaffected by

the fraud committed on his grantees. No conveyance made by the father could impair their title. The Glovers, as the result of the transaction, were defrauded out of their money by Ambrose W. Thompson, except to the extent of the value of his life estate, and the deed to the Glovers was no obstacle to the recovery by the children of their inheritance on the termination of the life estate of their father. They have never parted with their title by any deed or conveyance. But it is claimed that by reason of certain facts which will be stated, the Glovers and those who have succeeded to their title have retrieved their loss and have acquired an equitable title to the lot in fee, which they are entitled to enforce against the children, in whom the legal title was and is indisputably vested, notwithstanding the Statute of Frauds, which requires a deed or conveyance in writing to pass a freehold interest in lands, except in cases not now material to be noticed. (2 Rev. St. 135, § 6.)

What disposition was made by Ambrose W. Thompson of the consideration received from the Glovers, does not distinctly appear. It is claimed by the defendants that he used it in the purchase of a house and lot on Murray Hill in the city of New York. The claim rests upon very vague evidence. It was shown that in September, 1857, Ambrose W. Thompson had title to a house and lot on Murray Hill, but there is no evidence when he acquired it. In that year he exchanged this house and lot with John A. Dix for property in Rye, Westchester county, the Rye property being estimated in the exchange at the value of $25,000. Dix took the Murray Hill house and lot at the price of $10,000 (the same amount for which Thompson had sold the Hudson street lot), and at the request of Ambrose W. Thompson, conveyed the Rye property to his son Ambrose, taking back from the latter a mortgage of $15,000, the sum remaining due to him on the exchange.

In the same month Ambrose W. Thompson procured a declaration of trust to be prepared by his attorneys and caused it to be executed by the son, which was recorded in West-

chester county September 26, 1857, at the same time with the deed from Dix. This declaration of trust is an important document in the case. It recites the ownership by Mary Evelina Thompson at the time of her death in 1845, of a certain house and lot in Hudson street (without describing it), and then proceeds as follows: " And, whereas, the said Ambrose W. Thompson has, since the death of his said wife, caused the said real estate and premises to be sold and conveyed, and then received and has since held, used and controlled the purchase-money thereof upon the distinct understanding, declaration and agreement that he held the same for the use and benefit of Ambrose Thompson, Emily Thompson, Mary Thompson, Margaret H. Thompson and Julia Thompson, children of the said Ambrose Thompson and Mary Evelina, his wife, to whom said house and lot descended on the death of their said mother, Mary Evelina; and whereas, the said Ambrose W. Thompson afterwards became seized of a certain dwelling-house on Madison avenue, in the city of New York, which house and lot he hath lately sold and conveyed to John A. Dix, of the town of Rye, Westchester county, in exchange for certain lands and premises described as follows (describing them), and the said Ambrose W. Thompson hath caused the conveyance of (the Rye property) to be executed by the said John A. Dix and Catharine Morgan, his wife, to one Ambrose Thompson by warranty deed in fee simple, bearing date the 15th day of August, 1857; and whereas, the sole purpose of such conveyance to me was to protect and secure to the said children of said Ambrose W. Thompson and Mary Evelina, his wife, the use and enjoyment of an amount of property equal to that left them by their said mother, as aforesaid, and to that end that I should hold and become seized of said lands and premises in trust for myself and the said Emily, Mary, Margaret H. and Julia, etc., and to carry such purpose into effect I have promised and agreed to hold the same upon the said trust, and have accepted said deed and taken possession of the said premises as such trustee; now, therefore, I, the said Ambrose Thompson, do hereby declare, signify and agree to and with the said

Ambrose W. and the said Emily, Mary, Margaret H. and Julia, that I and my heirs and assigns do, shall and will from henceforth stand seized and possessed of the said above-described lands and premises, so as aforesaid conveyed by John A. Dix and Catherine Morgan, his wife, to me, in trust for the use and benefit of myself and the said (four sisters) and of our heirs and assigns forever. And I do also agree and covenant to pay over to them, the said Emily, Mary, Margaret H. and Julia, the proceeds of the said lands and premises until the youngest of them shall arrive at the age of twenty-one years, at which time, or such earlier time as may be proper, I will convey the same to them, their heirs and assigns in fee simple," etc.

When this declaration of trust was made Ambrose Thompson, who executed it, was under twenty-one years of age. The father at the time, as the evidence tends to show, was insolvent and pressed with debts. He directed the entire transaction; the conveyance from Dix to the son and the execution by him of the declaration of trust. It does not appear that the sisters of Ambrose knew of the declaration of trust at the time, or that they ever at any time saw it, nor does it appear that any of the children were then cognizant of the circumstances of the conveyance of the Hudson street lot to the Glovers. The declaration of trust recites that Ambrose W. Thompson " had caused the lot to be sold." The natural inference which would be drawn from the recital by one unacquainted with the circumstances, is, that by due authority of the court or otherwise, the father had conveyed the interest of his infant children.

The trial judge, in directing a verdict for the defendants, found that the consideration received by Ambrose Thompson on the sale of the Hudson street lot went into the purchase of the Murray Hill lot and finally into the Rye property. It is said that the recital in the declaration of trust warrants this inference, although the fact is not directly asserted therein. It is also insisted that the children knew this to be the fact. One Tuthill, who had been employed by Dix as a gardener on the Rye property, and who remained on the place for two or

three weeks after the Thompson family came there in 1857, testified to hearing a conversation between the father and the four girls at meal-time, in which Emily the eldest, then nineteen years of age, said "her father took her mother's money to buy that place (Rye) and gave it to her brother Ambrose." Also, "that they had a very handsome property on Murray Hill and her father had traded it away for that island." He also testified that two or three years afterwards he went to the house to fix some sashes and heard Emily say "they had cheated her out of her part; that she had nothing, only as they had a mind to let her stay there; the place belonged to her brother Ambrose; that her father gave the deed when he traded with John A. Dix, in Ambrose's name, instead of giving it in the children's name; that her father had cheated the girls out of that property and sold it all to her brother; that her mother had left her an interest, but her father had taken it away; that it was on Murray Hill the property her father had traded off." The testimony of this witness was given thirty years after the alleged conversations, and it does not appear that in the meantime they had ever been recalled to his attention. Mrs. Hewson, another witness for the defendants, with whom Mary, the second daughter lived for five years prior to her death in 1870, testified that Mary spoke of the Rye property and said that she had an interest in it which she had inherited from her mother. As further evidence upon this point, it is insisted that the children knew at least as early as 1868 (when they joined in a conveyance of the Rye property) of the declaration of trust, since the presumption is that they had read it and knew the recital therein.

The history of the Rye property after its conveyance to Ambrose Thompson in 1857, has an important relation to the case. The father, Ambrose W. Thompson, removed there with his family soon after the purchase from Dix in 1857, and lived upon the premises for a period of five or six years, and then removed with his daughters to Washington, and he never again occupied the place. The father paid the interest on the $15,000 mortgage to Dix up to March 1, 1860, and

from that time the interest accumulated so that at the date of the decree of foreclosure of the mortgage October 16, 1867, there was due thereon $21,125.53. In April, 1865, Ambrose Thompson, without the knowledge of his sisters, and presumably at the request of his father, executed a second mortgage on the Rye property to one Davids for $6,000, to secure a debt of the father. In April, 1866, Ambrose Thompson executed in his individual name and as trustee for his sisters, to one Stewart, a written contract of sale of the Rye property, subject to the Dix mortgage, in which there was a special covenant on the part of the vendor that no consideration had been paid for the Davids mortgage. In the report of the referee in the surplus proceedings taken after the sale on the foreclosure of the mortgage (which was put in evidence by the plaintiffs), it is stated that "the contract was duly delivered to Stewart for a good and valuable consideration and that Stewart assigned the same by parol to one Bonney (claimant of the surplus) for a good and valuable consideration, before the execution of the deed given in pursuance thereof, and that on or about the 18th day of October, 1867, Ambrose Thompson and his four sisters, in compliance with the terms of said contract and in satisfaction thereof, made and executed a deed to Bonney." The report also states that when the deed was delivered to Stewart, the name of Bonney was not inserted therein, but was afterwards inserted under the direction of an attorney, and that the sisters of Ambrose Thompson entrusted the deed to him and authorized him to use the same as it was used, and that he knew when it was delivered to Stewart that Bonney's name was to be inserted as grantee. The referee further found that the deed was delivered by Stewart to Bonney in payment for money advanced by Bonney to him, exceeding the amount of the surplus money. The surplus was $5,486.92, which was awarded and paid to Bonney, the claim under the Davids mortgage having been overruled. The Bonney deed, which expressed a consideration of $60,000, was dated October 18, 1867, three days after a decree of foreclosure of the Dix mortgage had been entered, and was

executed by Ambrose Thompson individually and as trustee for his sisters, and also by each of his sisters.

It does not appear distinctly that the children of Ambrose W. Thompson have received anything from the Rye property, or that the consideration for the contract of sale made with Stewart was any benefit derived by them, except that Mrs. Hewson testified that Mary signed the deed to Bonney at the request of Stewart, who informed her at the time that the deed was for money advanced by him to her and her sisters, and that witness also testified that Mary said she and her sisters had received large sums of money from Stewart. Mrs. Hewson also testified that she knew that Mary and her sisters had received money from him. It appears that Stewart had business relations with Ambrose W. Thompson, and the witness said that the father was out of the country when the advances were made by Stewart, and that Mary was under the impression that it was her father's money he was giving her. On the day of the execution of the deed to Bonney, Ambrose W. Thompson addressed a letter to his son, requesting him to execute the deed presented by Mr. Stewart.

When the children first knew of the fraud committed by their father in the sale to the Glovers does not appear. The husband of one of the daughters testified that in 1872, his wife told him that her mother had died leaving this property (Hudson street lot) in her own name, and the step-mother having the same name, had sold the property. No notice was ever given by any of the children to the persons in possession of the Hudson street lot of their claim of title, until about the time of the commencement of the action. It does not appear that they knew who was in possession, or that any improvements had been or were being made on the property.

Upon the conclusion of the evidence each party asked the court to direct a verdict in his favor, and the court thereupon directed a verdict for the defendants. The question to be determined is whether this direction was justified. The effect of a request by each party for a direction of a verdict in his favor clothed the court with the functions of the jury, and it is

well settled that in such case where the party whose request is denied, does not thereupon request to go to the jury on the facts, a verdict directed for the other party stands as would the finding of a jury, for the same party, in the absence of any direction, and the review in this court is governed by the same rules as apply in cases of ordinary verdicts rendered without any direction. All the controverted facts and all inferable facts in support of the judgment will be deemed conclusively established in favor of the party for whom the verdict was directed. (*Koehler* v. *Adler*, 78 N. Y. 287.)

The plaintiffs established an unquestioned legal title to the premises in controversy. Whether, upon the facts proved, construed most favorably for the defendants, a case was made upon which, according to the principles of courts of equity, the plaintiffs are prevented from asserting their legal title against the defendants, is the real point in controversy. The case is important as between the parties, and still more important because it involves in its wider aspects a question affecting the security of all titles to real property, and a consideration of the circumstances under which a legal title may be practically subverted and lost, although the true owner has never executed any deed or conveyance of or any writing agreeing to convey his land.

The counsel for the plaintiffs raises a point which may properly be considered before proceeding further with the discussion. It is in substance that the deed to the Glovers neither passed nor purported to pass any greater interest in the Hudson street lot than the life interest of Ambrose W. Thompson, and that, therefore, the question whether the proceeds of the sale were applied by the father to the benefit of his children, is an immaterial consideration. The Glovers, it is said, got all they bought or paid for, and they or their grantees have no concern with and no rights or equities growing out of the disposition of the proceeds. Much stress is put by counsel upon the statute declaration (1 Rev. St. 739, § 143), that "no greater estate or interest shall pass by any grant or conveyance hereafter executed than the grantor himself pos-

sessed at the delivery of the deed, or could then lawfully convey, except that every grant shall be conclusive as against the grantor and his heirs claiming from him by descent." There can be no doubt that the conveyance to the Glovers operated in law to convey the life estate of the grantor only. The section of the statute quoted is a statutory declaration of the inapplicability to our modes of conveyance of the doctrine of the ancient common law, whereby a feoffment made by a life tenant, or by a person in possession of lands, although his possession was wrongful, had the transcendent power of creating an actual estate in fee in the feoffee, divesting the seizin and title of the true owner, and leaving him or those entitled in expectancy a right of action only. This "and the other common-law modes of assurance by fine and recovery, had the power of creating estates where none existed before, only limited by the will of the grantor at the time of the grant, although they might be subsequently defeated by an action." (Co. Litt. 370a; *Sparrow* v. *Kingman*, 1 N. Y. 250; 2 Smith's L. C. 730; Reviser's Note to § 143.) Under our statute no such consequence can follow. The title and estate which passes under a grant or conveyance, is commensurate only with that existing in the grantor, although he may undertake to convey, and the deed purports to convey a larger estate. His conveyance cannot affect interests in remainder, and divests no estate except his own. While it is true, therefore, that Ambrose W. Thompson could only in law convey his life estate, and the Glovers only acquired that estate, the other part of the proposition of the counsel for the plaintiffs that the deed purported to convey that estate only, is untenable. The *quantum* of estate intended to be conveyed by a deed is to be ascertained from its language. The deed of Ambrose W. Thompson was not limited to a life estate, nor was it a quit claim only of his interest in the land. The deed in form was a conveyance of the land to the grantees, their heirs and assigns, and this, unexplained by the context, imports a conveyance of the entire fee. It contains a covenant of general warranty, whereby Thompson and his then wife covenant

to warrant and forever defend the land " against all and every other person or persons whomsoever lawfully claiming or to claim the same." The intention of the grantor to convey an absolute fee is apparent not only on the face of the deed, but the extrinsic fact that the consideration paid by the Glovers was the full value of the fee, is additional and conclusive evidence of the intention. It cannot be doubted that if Ambrose W. Thompson had subsequently acquired the title in remainder, vested in the children, it would have inured to the benefit of the Glovers and their grantees, under the familiar doctrine of estoppel by deed, Whether a general warranty in a deed, not limited by recitals to a particular and limited estate, has the efficacy of actually vesting a subsequently acquired title of the warrantor at the moment of its acquisition, in his grantee, or as some claim, the warranty operates as a rebutter only of any subsequent claim of the grantor to the warranted premises, is not here material. A general warranty, not limited by other parts of the deed, however it technically operates, is only consistent with an intention of the grantor to convey the whole estate. The rule found stated in some of the books that there is no estoppel where an interest passes, according to the modern cases, has no application to conveyances intended to pass the whole title, although the grantor had a limited interest which was carried by the conveyance. (*House* v. *McCormick*, 57 N. Y. 310; 2 Smith's L. C. 692; *Long Island R. R. Co.* v. *Conklin*, 29 N. Y. 572.) The contention, therefore, that the deed to the Glovers purported to convey only the life estate of the grantor cannot be supported.

It is convenient in this connection to refer to a contention of the defendant in support of the defense of the Statute of Limitations. That contention is that at common law a conveyance by a tenant for life of the fee, or of a greater estate than he possessed, operated as a forfeiture of the estate actually vested in the grantor, and authorized those in remainder to immediately maintain an action to be let into possession. It is, therefore, insisted that the Statute of Limitations was put in motion against the plaintiffs as soon as the conveyance of

Ambrose W. Thompson to the Glovers was executed, or as soon at least as they attained their majority, which latter event occurred as to the youngest child, more than twenty years prior to the bringing of the action. Another section of the statute is a complete answer to this claim. It declares (1 Rev. St. 739, § 145) that "A conveyance made by a tenant for life or years of a greater estate than he possessed or could lawfully convey shall not work a forfeiture of his estate, but shall pass to the grantee all the title, estate or interest which such tenant could lawfully convey." The protection intended to be conferred on the grantee by this section would be illusory if the remainderman, upon the theory of a forfeiture of the precedent estate by the conveyance by the owner thereof of the fee, was permitted to immediately enter upon the land. But under the common-law rule the heir was not bound to take advantage of a forfeiture, but might postpone his entry until the death of the tenant for life, and meanwhile the statute did not run against him. (*Jackson* v. *Mancius*, 2 Wend. 357 ; 2 Kent Com. 84.) The defense of the Statute of Limitations, therefore, was not made out. The life estate of the father terminated by his death in 1882, and the action was brought in 1887.

The defense in this action, if any exists, must rest either upon the doctrine of equitable estoppel, or upon the ground that the plaintiffs accepted the Rye property in satisfaction of, or in substitution for their interest in the lot on Hudson street. The doctrine that the owner of land may, by his acts, preclude himself from asserting his legal title against one who, in reliance thereon, has placed himself in a position where to allow the legal owner of the land to assert his legal right, would operate as a fraud upon the other party, is an established doctrine of courts of equity. The Statute of Frauds is not an obstacle to the exercise of this jurisdiction, and the reason usually assigned is that a court of equity will not permit a statute made for the prevention of frauds to be used as an instrument of fraud. The leading cases in this state of *Wendell* v. *Van Rensselaer* (1 Jo. Ch. 344) and *Storrs* v.

*Barker* (6 id. 166) illustrate the application of the principle. In the first case the grantee of land, holding a secret deed, studiously concealed its existence, and knowing that the grantor was dealing with the land as his own, conveying parts thereof to third persons, and that they were making valuable improvements in reliance on the validity of their titles, he meanwhile standing by and making no sign, was held to be estopped from setting up his deed against the subsequent grantees of the original owner.   In the second case a father who, on the death of a married daughter, became by law vested by descent with the title to lands owned by the daughter, but which she, by her will, had undertaken to devise to her husband, was held to be precluded from asserting his title against the grantee of the husband, the father having encouraged the husband to sell and the grantee to buy, and having assured the purchaser that he had no title by inheritance by reason of the devise. The devise was in fact void by reason of the coverture of the wife, and although the father in advising the purchase acted in good faith, supposing at the time that the devise was legal, the chancellor applied the doctrine of estoppel on the ground that having encouraged the purchaser to buy, "equity and policy equally dictate that he and not the purchaser ought to suffer."   In the one case there was notice that the grantor of the defendant was conveying the land, and fraudulent silence, and in the other active intervention and procurement, which, though innocent in intention, would be fraudulent in result if the party was permitted to set up a right inconsistent with the title of the husband under the devise.   According to the general rule a fraudulent purpose or a fraudulent result lies at the basis of the doctrine of equitable estoppel.   (Sto. Eq. § 1546.) A party is concluded from denying his own acts or admissions, which were expressly designed to influence the conduct of another and did so influence it, and where such denial will operate to the injury of the latter.   (NELSON, J., *Welland Canal Co.* v. *Hathaway*, 8 Wend. 483.)

An estoppel may arise although there was no designed fraud on the part of the person sought to be estopped.   The cases

of *Storrs* v. *Barker* (*supra*), and *Continental National Bank* v. *National Bank of Commonwealth* (50 N. Y. 576), were cases where there was no intent to mislead, but where what was said was intended to influence the action of the other party and did influence it, and a duty rested upon the party giving the information or making the statement, if he spoke at all, to have ascertained the actual facts so as not to have misled the other party to his prejudice. An estoppel may arise also from silence as well as words. But this is only where there is duty to speak, and the party upon whom the duty rests has an opportunity to speak, and knowing the circumstances requiring him to speak, keeps silent. (*Viele* v. *Judson*, 82 N. Y. 32; *Hamlin* v. *Sears*, Id. 327; *N. Y. Rubber Co.* v. *Rothery*, 107 id. 310.)

It is impossible, we think, to find in the facts of the present case the essential elements of an estoppel *in pais* against the plaintiffs, concluding them from asserting their title to the premises in controversy. In 1853, when the Glovers purchased the lot, the oldest child of Ambrose W. Thompson was seventeen years of age. The wrong perpetrated by the father in inducing the Glovers to purchase and pay for the land was consummated without the knowledge of the children, and when they were ignorant of their rights in the property. So, also, when in 1857 the Glovers built upon the lot, there is no pretext that the children knew of the sale to the Glovers, or that the Glovers were in possession or claimed the title, or that the building was being erected, nor indeed is there any evidence that the children then had any knowledge of the existence of the lot in question, or that any property had descended to them from their mother.

If the doctrine of estoppel can be invoked against the plaintiffs, it rests upon the fact that having subsequently ascertained that the Hudson street lot had descended to them from their mother, and that their father had wrongfully conveyed it, they neglected for many years to give notice of their claim to the Glovers or their grantees, and that meanwhile Smith, the grantee of the Glovers, had conveyed the lot to the present

defendants, who, in 1882, expended $3,000 in improvements on the premises, all these persons being ignorant of the fraud and supposing that the title under the deed to the Glovers was valid and undisputed. When the plaintiffs first knew that the Hudson street lot belonged to them is left in doubt. The declaration of trust recites that the mother at her death was seized in fee "of a certain house and lot on Hudson street," which on her death descended to her children. There is no evidence that the daughters ever saw this declaration of trust, or indeed knew of its existence prior to 1868, when they joined in the deed of the Rye property to Bonney, and the fact that they then knew its contents is a mere inference from that act. The declaration of trust, assuming that they then were informed of it, gave no information as to what particular property on Hudson street was owned by their mother, or that their father had conveyed it in fraud of their rights, or to whom the conveyance had been made. In 1872, one of the daughters seems to have then known that her step-mother had sold the property by passing herself off as the first wife. The daughters were not bound, at the peril of losing their land, to seek out and notify the Glovers and their grantees of their title. They had no present right to the possession of the property. The life estate of the father passed by his deed and did not terminate until 1882. It does not appear that the daughters had any information at any time prior to the father's death, as to whom he had conveyed the lot, nor of the subsequent deeds. They resided for many years away from New York, and never came in contact with the parties claiming title under the deed to the Glovers. They had no notice who was in possession of the lot, nor that the parties in possession contemplated making improvements thereon. In fact no improvements were made after they were apprised of their rights, except those made by Simpson in or about 1882. The building which constituted the principal addition in value to the lot, was erected by the Glovers in 1857.

We know of no authority which would justify the application of the doctrine of estoppel to bar the assertion of a legal

title to real property under circumstances such as are disclosed in this case. The owner of property which another has assumed to convey without authority, is not precluded by mere silence from subsequently claiming it. There must in addition have been both an occasion and a duty to speak, and it must appear that the omission to speak, upon opportunity being presented, was intentional or in negligent disregard of the plain dictates of conscience and justice. It is not necessary that the duty to speak should arise out of any agreement, or rest upon any legal obligation in the ordinary sense. Courts of equity apply to the case the principles of natural justice, and wherever these require disclosure they raise the duty and bind the conscience and base upon the omission an equitable forfeiture to the extent necessary to the protection of the innocent party. The mere fact that another may act to his prejudice, if the true state of things is not disclosed, does not render silence culpable, and mere inaction in such a case is not sufficient. (Bigelow on Estoppel, 595.)

The true owner owes no duty of active diligence to protect the other party from injury. There must be a standing by and encouragement, or at least an acquiescence, on the part of the true owner in acts inconsistent with his right, knowing that the other party, acting under a false impression, is about to do what will result in his injury. (See cases, *supra.*) The doctrine of estoppel *in pais* is inapplicable in this case for two reasons : *First*, the daughters had no knowledge of the facts until after the principal grievance and injury under the father's deed had been suffered, and after the facts came to their knowledge, they did nothing to influence the conduct of the purchasers, nor did they maintain a culpable silence such as authorizes a court of equity to base relief thereon, and *second*, for the reason that neither the Glovers nor any of their grantees have been misled or deceived by any act or word of the plaintiffs, nor have they relied upon any alleged "substitution of property," or upon any appearances or holding out by the plaintiffs inconsistent with the actual truth. The security of legal titles to real property and the uniform policy

of the law require that the doctrine of equitable estoppel, when invoked to bar the assertion of a legal title to land, should be cautiously applied, and only when the grounds for its application are clearly and satisfactorily established. (*Trenton Banking Co.* v. *Duncan*, 86 N. Y. 222.)

The remaining defense that the proceeds of the sale to the Glovers went into the purchase of the Murray Hill property and afterwards into the Rye property, and that the plaintiffs accepted the latter property in substitution for their interest in the Hudson street lot, is much more serious.   These facts were found by the trial judge, and we are concluded by the findings if they are sustained by evidence.   In the case of *Broomall* v. *McCallion* (6 Cent. Rep. 715), decided in Pennsylvania, several brothers and sisters in possession of land descended to them from their father, one of them bearing the same name as the father, personating him and passing off the property as his own, conveyed it without the knowledge of his co-heirs in exchange for other land, to a purchaser who was deceived by such identity in name, and the other heirs, on being informed of such exchange, removed with the brother to and took and remained in possession of the land conveyed to him in exchange, and it was held that by so doing and without giving notice of their title to the purchaser, they were estopped from setting up as against the purchaser want of title in their brother to the property conveyed by him.   It was also held in *Goodman* v. *Winter* (64 Ala. 410), that where a tenant for life sells and conveys in fee in good faith, believing he has power to do so, and the remainderman accepts a portion of the purchase-money as compensation for his interest, or if the proceeds of the sale are invested by the tenant for life in other lands, taking the title to himself for life, with remainder as before, and the remainderman accepts such conveyance with full knowledge of the facts, in either case a court of equity will, at the instance of the purchaser, compel the remainderman to convey to him or bar the remainderman from asserting his legal estate in the lands so sold and conveyed.

Where one, without title or authority from the real owner,

assumes to sell and convey the land in fee and the true owner, knowing the facts, consents to, and does accept the proceeds of the sale in full satisfaction of his interest, this ought in equity to operate as a confirmation of the unauthorized sale and preclude the real owner from asserting his legal title. The sale in the case supposed may be treated as his act, or at least it may operate in connection with the receipt of the purchase-money as an agreement on his part to sell to the purchaser and as a payment by the latter to the true owner of the consideration. The doubtful point in this defense in the present case arises from the weakness of the evidence tending to show that the proceeds of the sale of the Hudson street lot went into the Rye property, and also as to the other element, viz., that the children, knowing the facts, consented to accept the Rye property in substitution for their interest in the Hudson street lot. The transaction was, in its origin at least, clearly to the disadvantage of the children. The trust in the Rye property was created by the father without the consent or knowledge of the children, except the son Ambrose. It may be assumed that a court of equity, if it had been applied to in behalf of the infants for authority to exchange the Hudson street lot for the Rye property, subject to a mortgage of $15,000, which they had no means to pay, would not have authorized the exchange. The evidence of the acceptance by the daughters of the Rye property for the Hudson street lot, rests mainly upon the fact of their joining in the deed to Bonney and in the admissions proved to have been made by the daughter Mary, and the testimony of Mrs. Hewston that advances were made to the children by Stewart, which was the consideration of the deed to Bonney, his assignee.

The execution of the deed by the daughters was subject to explanation. If they joined in the deed at the request of the father, as a means of restoring to him the land, or to enable him to carry out the contract of sale to Stewart, made on a consideration passing between him and Stewart, then the act of the daughters would not seem to be inconsistent with a repudiation of the trust. The record title of the Rye property

was vested in the children by operation of the conveyance to Ambrose and the declaration of trust, and their conveyance would be necessary to make a good title of record. On the other hand, their act was consistent with the prior acceptance by them of the substituted provision. The matter is left unexplained by any evidence on the part of the plaintiffs. Neither Ambrose, the son, nor his surviving sister, was put on the stand to explain the circumstance. We have then (1) a conveyance by the children of the Rye property, in form a conveyance of the fee, for an expressed consideration of $60,000, acknowledged in the deed to have been received by the grantors; (2) the finding of the referee in his report on the distribution of the surplus arising on the foreclosure of the Dix mortgage, of the circumstances connected with the contract of sale to Stewart and the subsequent deed to Bonney; (3) some evidence, though slight, that the consideration of the Stewart contract was money advanced by him to the daughters on the credit of their interest in the Rye property, and finally we have the fact that no explanation was attempted to be given by the surviving children of the circumstances and motives which led to the execution of the deed, and further, a delay by the plaintiffs for five years after the death of their father before bringing their action. Upon this state of the record we cannot say that there was no evidence upon which to base the finding that the children accepted the Rye property in lieu of their interest in the Hudson street lot, with knowledge of their rights, and if this was the fact, the defense was, we think, sustained.

If a new trial should be taken by the plaintiffs under the statute, and a different result on the facts should be reached, the question might then arise whether, under the peculiar circumstances, equity would not require that the purchasers should be indemnified out of the property for the enhanced value by reason of the improvements made by the defendant Simpson and his grantors. Upon this point we express no opinion. It may also be a question whether Ambrose Thompson does not stand in a situation different from his sisters in respect to claiming any interest in the Hudson street lot.

The exception of the plaintiffs to the evidence given on the part of the defendants tending to show that the Glovers purchased in good faith, believing that they were acquiring a perfect title, was not well taken. It was proper to permit the defendants in aid of their equitable defense, to show the circumstances under which the Glovers purchased.

The judgment should be affirmed.

All concur.

Judgment affirmed.