No. 28,612.

ELMA KELLING, as Executrix of the Will of Henry Kelling, Deceased, *Appellee*, v. WILLIAM BROOKS et al., *Appellants*.

(275 Pac. 1077.)

Opinion filed April 6, 1929.

*A. L. Drummond,* of. Norton, *T. M. Sullivan,* of Logan, and *J. T. Reed,* of Smith Center, for the appellants.

*L. H. Wilder,* of Norton, for the appellee.

The opinion of the court was delivered by

HARVEY, J.: This is an action to foreclose a mortgage. The sole question here presented is whether the mortgage is a lien on the

real property in controversy, and if so, the extent of such lien. The trial court held it to be a first lien, and from this the defendant, William Brooks, has appealed.

The facts, except as to one or two details, are not seriously controverted and may be stated as follows: William Brooks was, and had been for many years, the owner of a certain 440 acres of land in Norton county. On May 26, 1920, he and his wife contracted to sell this land to Frank Kemper for $20,240. Kemper paid $2,000 at the time the contract was made and $440 about thirty days later. By the terms of the contract he was to pay the entire balance of the purchase price March 1, 1921. Brooks and wife executed to Kemper a general warranty deed for the property, had abstracts brought to date, and by agreement of the parties deposited the deed and abstract and the contract in escrow in the First National Bank of Logan, Kan., the deed and abstract to be delivered to Kemper on the payment of the balance of the purchase price. Kemper went into possession of the real property, as by the contract he was authorized to do. On March 1 or 2, 1921, Kemper borrowed $5,000 from Henry Kelling, which money he paid to Brooks on his contract. He had previously borrowed $600 of Kelling, hence the note was made for $5,600. To secure this note he gave a mortgage on 160 acres of the 440 acres which he had contracted to buy from Brooks. This mortgage was recorded sometime in May, 1922. This is the mortgage foreclosed in this action. Kemper thought he could get the balance of the money from other sources to pay Brooks, but was unable to do so, and a few months later, although dated March 1, 1921, Kemper and Brooks executed an agreement extending the time for the payment of the balance of $12,800, with interest under the original contract, to May, 1922. Kemper was unable to pay the balance within that time, and Brooks brought an action against Kemper to foreclose his contract as an equitable mortgage for the balance due thereon, $12,800, with interest, and procured a decree of foreclosure, and the property was sold and purchased by Brooks for the total amount due thereon. Thereafter, and in May, 1925, Henry Kelling brought this action for a personal judgment against Frank Kemper and his wife on the note for $5,600 and interest, and to foreclose his mortgage on the 160 acres of land given him by Kemper and wife as against Kemper and wife and William Brooks and wife.

The mortgage in question was executed at the First National Bank of Logan, March 2, 1921. Kemper had previously arranged with Kelling to borrow $5,000 from him, and they were to meet at the bank. Kemper met Brooks outside of the bank before the mortgage was executed and told Brooks he was getting $5,000 from Kelling. There is a controversy as to this conversation. Kemper testified that he told Brooks that to get the money from Kelling he would have to give a mortgage on 160 acres of the land, and Brooks said that would be all right. Brooks testified that Kemper spoke to him about giving a mortgage on the land, and he told Kemper that he did not want it mortgaged. The court's finding was in accordance with Kemper's testimony, and this settles the controverted facts so far as this court is concerned. Brooks was not present in the room in the bank when the mortgage was drawn, or if there at all, took no part in any conversation or transaction, although he knew that some papers were being drawn and probably suspected a mortgage was being drawn. He told D. L. Noone, the active managing officer of the bank, who drew the papers that day prepared, to look after his interests and not to let the deed and abstracts be delivered unless the full balance of the purchase price was paid. Brooks and Kelling had no conversation on that day about anything. After the note and mortgage had been executed by Kemper and wife, Kelling made two checks of $2,500 each to Kemper, which he deposited to his account, which Kemper then paid, or caused to be paid or credited, to the account of William Brooks. Kelling then asked Mr. Noone to send his mortgage to the register of deeds for record. Noone told him that it would do no good to send it; that Kemper had no title to the land—all he had was a contract of purchase—and that he would not have title until he completed his payments to Brooks. Kelling thought maybe he had not been treated right, talked of bringing a replevin suit for his checks or the money he had paid to Kemper, but in fact did nothing. A few weeks thereafter Kelling went to Kemper and insisted on having some other security for the money he had loaned Kemper. Kemper told him he would give him another note with other persons signing it with him as surety. He did this, getting other persons to sign the note with him. He represented to Kelling that he would get a certain uncle of his to sign the note with him, but he did not succeed in doing that. He later took the note to Kelling's house and

left it there when Kelling was in the field. Kelling did not accept this note, other than as additional security. At the time his deposition was taken he had possession of the note and stated he would not give it up until he was paid. There was evidence to the effect that Brooks, prior to March 1, 1921, had purchased some other land from a man by the name of Biglowe and had agreed to pay him $6,000 on March 1, 1921, and there was a little evidence, other than above stated, tending to show that Brooks encouraged Kemper to make the loan from Kelling in order that Brooks might have the money to pay Biglowe. The trial court found that was true on the controverted evidence, and, so far as it has any real bearing on this case, it must be regarded as settled.

In support of the judgment of the court below it is urged here, and was urged in the court below, that by orally authorizing Kemper to give a mortgage to Kelling, in order to get from him $5,000 to pay Brooks on his contract, Brooks is estopped from denying that the mortgage is good as against him; and, further, that Brooks, having received as a payment on his contract with Kemper, the $5,000 which Kemper borrowed from Kelling, it would be unjust to permit him to retain it and contest the validity of the mortgage. The trial court's judgment was in accordance with these views.

The judgment of the court below rests upon the equitable doctrine of estoppel by failure to disclose title. This principle has been stated in different wording in various cases, most of which are collected in the annotation in 50 A. L. R. 668-973, which annotation is an exhaustive treatise of the subject. The principle is there stated in its most general and comprehensive form as follows:

"The holder of an estate or interest in real property who stands by and remains silent with regard to his rights, when he knows that another party is undertaking to sell or mortgage the property to a third person, is estopped from thereafter asserting his estate or interest to the prejudice of that person, unless it appears that the latter had notice, either actual or constructive, of the real condition of the title." (50 A. L. R. 671.)

Defendant contended that the principle could not be relied upon because of the statute of frauds (R. S. 33-106), which was sufficiently pleaded by his general denial in this case. (*Wiswell v. Tefft*, 5 Kan. 263; *Jamison v. Christman*, 95 Kan. 131, 148 Pac. 247.) But the statute of frauds is not an obstacle to the exercise of the equitable principle above mentioned, for the reason that a court of equity will not permit a statute designed for the prevention of

fraud to be used as an instrument of fraud. (*Thompson et al. v. Simpson et al.*, 128 N. Y. 270.) The equitable doctrine relied upon is predicated upon the theory that one who, by active conduct or by remaining silent when in fairness he ought to have spoken, shall be debarred or estopped from taking a different position at a later time, for to do so would be to permit him to perpetrate a fraud. (*Harris v. American Building & Loan Association*, 122 Ala. 545; *Gray v. Crockett*, 35 Kan. 66, 12 Pac. 129; *Osborn v. Elder*, 65 Ga. 360.)

But it is essential for the application of this doctrine that the party claiming to have been influenced to his injury by the conduct or declaration of another was himself not only destitute of knowledge of the true situation of the title, but also of any convenient or available means of acquiring such knowledge. (*Brant v. Virginia Coal & Iron Co. et al.*, 93 U. S. 326, 337.) Our registry statutes are designed to enable persons dealing with real property to know something of the condition of the title. They were available to Kelling, and under the authority of many of the cases noted in 50 A. L. R., 734 *et seq.*, he was bound, from that record, to know that the title of this land was in Brooks and was not in Kemper. But aside from such constructive notice the record in the case before us discloses that Kelling knew that Brooks had owned this land and had sold it to Kemper on a contract; that Kemper had not fully paid for it, and was borrowing this money to pay on this contract. Kelling met Kemper at the bank where this contract was held in escrow. Anything he did not know about it he could readily have learned either of Kemper or of D. L. Noone in charge of the bank. He did in fact know before he left the bank on that day, and perhaps before the mortgage was signed and he had paid any money on it, that Kemper did not have title to the land, for which reason the mortgage itself should not be recorded, and that it was useless to send it to the county seat. But he completed the loan, or let it stand, notwithstanding such knowledge. In Kelling's deposition used on the trial of this case he was very positive in his statement that he made the loan and paid over the money in the belief that Kemper had good title to the land. Under the facts he was not entitled to entertain that belief, either from the public records, or from the information which had been conveyed to him with respect to it by Kemper and by the banker Noone. Perhaps what he did rely upon, to the extent he relied upon any representations other than the

record as it actually existed, was the expressed hope of Kemper that he would be able to get from other sources the balance of the money to pay Brooks, which would enable him to get his deed and would make the mortgage to Kelling good; but this suggestion is somewhat speculative, and it is not material. The unquestioned facts are that Kelling had constructive knowledge from the public record that this land was owned by Brooks, and that Kemper had no title to it; and he had actual knowledge, conveyed to him both by Kemper and by Noone, that the land had been purchased from Brooks under a contract that Kemper could not get title to it until the contract price was fully paid. Brooks was in Logan on March 2, 1921. Kelling saw him there, but made no inquiry of him concerning the matter. He did not have the mortgage given him by Kemper recorded until May, 1922. In the meantime, and within a few weeks after the mortgage was given, he had gone to Kemper and had insisted on having additional security for the money he had loaned Kemper, and a new note with sureties was given him by Kemper, which was retained as additional security, but not as a substitute for the mortgage. Kelling made no claim against Brooks under this mortgage for interest, or in any respect, until he brought this action in August, 1925.

Under the situation disclosed by the record in this case the equitable principle relied upon by plaintiff is not applicable. To apply it here would permit Kelling, in the face of the condition of the record known to him, or at least readily available to him, and simply because of the silence of Brooks on the subject, to gain an advantage over Brooks in the transaction.

The result is that Kelling got a mortgage on Kemper's interest in the property, but not upon the interest of Brooks. Before this action was brought Brooks had foreclosed, as against Kemper and his wife, the contract between them as an equitable mortgage. We take it from the record before us that Kelling was not made a party to that action; therefore his rights as against Kemper were not barred by that action. All the parties are before the court in this case, hence the court can make a proper order applicable to all of them.

From what has been said it necessarily follows that Henry Kelling obtained by the mortgage in suit in this action no lien upon the interest of Brooks in the property described in the mortgage, and his executor, the plaintiff here, cannot enforce any lien by reason thereof as against Brooks.

The fact that Brooks received the money which Kemper borrowed from Kelling would not prevent Brooks from claiming title to the land. Brooks was entitled to receive from Kemper on that day not only $5,000, but $17,800, and he was not necessarily concerned with the arrangement Kemper made for obtaining that money. He did credit Kemper with the amount then paid. Kemper in fact had an equitable interest in the land by reason of his contract to purchase and the payments previously made. This was such an interest in the land that he might have sold it or mortgaged it. This equitable interest in the land was increased by the $5,000 which he then paid on his contract. The fact that he could sell or mortgage his interest in this property did not, of course, authorize him to sell or mortgage Brooks' interest in it.

The judgment of the court below should be reversed as to the lien of the mortgage on the interest of Brooks in the property, and the decree of the court should be modified accordingly.

It is so ordered.