(70 South. 539)

Nos. 20503 and 20529.

GALLAGHER v. CONNER.

(Nov. 15, 1915. Rehearing Denied Jan. 10, 1916.)

*(Syllabus by Editorial Staff.)*

1. VENDOR AND PURCHASER ⟨⟩239 — BONA FIDE PURCHASERS — FRAUDULENT CANCELLATION OF RECORD—EFFECT.

Where the records of mortgages were fraudulently canceled without the consent of the mortgagees, such cancellations had no effect to free the lands, in the hands of third persons who acquired the property in good faith relying upon the clear record, from subjection to the mortgages.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 583–600; Dec. Dig. ⟨⟩239; Mortgages, Cent. Dig. § 368.]

2. ESTOPPEL ⟨⟩30—DENIAL OF TITLE.

In a suit to enforce mortgages, defendants were improperly permitted, in attempting to make a defense, to introduce evidence to show that a person other than those under whom they held had been the true owner of the lands when the mortgages were created, since a party cannot impugn the title under which he holds.

[Ed. Note.—For other cases, see Estoppel, Cent. Dig. § 74; Dec. Dig. ⟨⟩30.]

3. VENDOR AND PURCHASER ⟨⟩239 — BONA FIDE PURCHASERS—VALIDITY — SUCCESSIVE MORTGAGES.

Where the owner of lands created successive mortgages thereon, through successive persons interposed as straw owners, after having fraudulently caused each preceding mortgage to be canceled of record to make room for each succeeding one, the rights of the holders of the mortgage paper against the lands in the hands of bona fide purchasers were perfect, except that the several mortgages ranked in the order in which they were created and recorded, as owners subsequent to the fraudulent owner took the property burdened with the mortgages.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 583–600; Dec. Dig. ⟨⟩239; Mortgages, Cent. Dig. § 368.]

4. VENDOR AND PURCHASER ⟨⟩239 — BONA FIDE PURCHASERS — MORTGAGES BY STRAW OWNERS—VALIDITY OF MORTGAGE PAPER.

Where the owner of lands created successive mortgages upon his property through successive straw owners after having fraudulently caused each preceding mortgage to be canceled of record to make room for each succeeding one, the mortgage paper, though without vitality in the hands of the owner, acquired vitality by negotiation, and no act of the owner after negotiation could create equities in favor of third persons as against the holders of the paper, since an owner may make a mortgage in favor of a mere nominal mortgagee, or even dispense altogether with a present mortgagee and consent the mortgage in favor of any future holder of a note he has made to his own order and secured by the mortgage.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 583–600; Dec. Dig. ⟨⟩239; Mortgages, Cent. Dig. § 368.]

5. VENDOR AND PURCHASER ⟨⟩239 — BONA FIDE PURCHASERS — RIGHTS OF THIRD PERSONS—EQUITIES.

Where the owner of land successively mortgaged it through straw mortgagors, fraudulently procuring each preceding mortgage to be canceled of record to make room for the next, the fact that third persons purchased the mortgage paper from the owner without causing the record to be examined and without investigation aliunde the record, while purchasers of the land consented to buy only after counsel had found the title clear of record, created no equities in favor of such purchasers of the land against the holders of the mortgage paper, since equity can be invoked only in the absence of positive law, while the case was governed by legal principles.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 583–600; Dec. Dig. ⟨⟩239; Mortgages, Cent. Dig. § 368.]

6. VENDOR AND PURCHASER ⟨⟩239 — BONA FIDE PURCHASERS—RIGHTS OF THIRD PERSONS—EQUITIES.

Where the owner of land mortgaged it successively through straw mortgagors, each pre-

ceding mortgage being canceled of record to make room for the next, the purchasers of the lands, when the persons to whom the mortgage paper had been negotiated sought to enforce it, had no defense in the fact that the owner's frauds were committed, not upon them, who at the time were entire strangers to the property, but upon the mortgage creditors, and that the latter should be the ones to suffer.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 583–600; Dec. Dig. ☞239; Mortgages, Cent. Dig. § 368.]

7. MORTGAGES ☞463 — FORGERY OF MORTGAGE NOTE—SUFFICIENCY OF EVIDENCE.

In a suit to enforce mortgages, evidence *held* insufficient to show that a mortgage note was a forgery.

[Ed. Note.—For other cases, see Mortgages, Cent. Dig. §§ 1361, 1363–1368; Dec. Dig. ☞463.]

8. PAYMENT ☞8—IMPUTED PAYMENT.

Where the agent of the mortgagors of land received the mortgage note from the holder with mandate to collect it, only after the agent had embezzled from the mortgagors the funds which they had previously placed in his hands to pay the note, there was no payment thereof imputed against the holder, since a payment can be imputed only when the reception of the mandate to collect and the reception of the money wherewith to make the payment coincide.

[Ed. Note.—For other cases, see Payment, Cent. Dig. §§ 17, 18, 20, 21, 24–27; Dec. Dig. ☞8.

For other definitions, see Words and Phrases, First and Second Series, Payment.]

9. VENDOR AND PURCHASER ☞239 — BONA FIDE PURCHASERS — NEGOTIATION — SHAM NOTES—EFFECT.

Where an agent to invest money in notes, upon an accounting with his successor as agent, turned over, as representing an investment of the funds of the principal, purported mortgage notes, which, to the agent's knowledge, were mere shams, having been executed by straw men, purported owners of his own land, secured by mortgages, the negotiation of the notes, worthless so long as they remained in the hands of the makers, rendered them good and valid.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 583–600; Dec. Dig. ☞239.]

10. ALTERATION OF INSTRUMENTS ☞29—EVIDENCE—SUFFICIENCY.

Where mortgage notes were identified by the notary's paraph with the act of mortgage, and answered the description given of them in the act, the showing that they had not been altered was sufficient.

[Ed. Note.—For other cases, see Alteration of Instruments, Cent. Dig. §§ 259–263; Dec. Dig. ☞29.]

11. MORTGAGES ☞58—CONSENT UNDER PRIVATE SIGNATURE—STATUTE.

By direct provision of Civ. Code, art. 3305, a conventional mortgage can be contracted by an act under private signature.

[Ed. Note.—For other cases, see Mortgages, Cent. Dig. §§ 153, 154; Dec. Dig. ☞58.]

12. ACKNOWLEDGMENT ☞53 — RECORDATION WITHOUT ACKNOWLEDGMENT—VALIDITY.

A mortgage may be validly recorded without previous acknowledgment of signature.

[Ed. Note.—For other cases, see Acknowledgment, Cent. Dig. §§ 270–277; Dec. Dig. ☞53.]

13. ESTOPPEL ☞58—EQUITABLE ESTOPPEL—NECESSITY OF RELIANCE.

Rev. St. § 171, provides that it shall not be lawful for any auctioneer to sell any realty without reading a certificate of mortgages recorded against the property offered. An auctioneer who held an unrecorded mortgage note in pledge sold the land covered by the mortgage without knowledge that it was security for his note and without reading any certificate of mortgages. The purchasers of the property, who made full investigation of the title, before buying, contended the auctioneer was estopped to enforce his note against the land. *Held* that, since the auctioneer's procuring and reading a certificate of recorded mortgages would not have advised the purchasers of the existence of his unrecorded incumbrance, he was not estopped to enforce it, for to have an estoppel en pais or an equitable estoppel the party invoking it must show that he was misled to his prejudice by the act or conduct on which he seeks to found the estoppel.

[Ed. Note.—For other cases, see Estoppel, Cent. Dig. §§ 144, 145; Dec. Dig. ☞58.]

14. ESTOPPEL ☞94—EQUITABLE ESTOPPEL—FAILURE TO ASSERT TITLE.

An owner of land who stands by and remains silent while his property is sold to a purchaser in good faith, who believes the seller to be the owner, is estopped from thereafter asserting title.

[Ed. Note.—For other cases, see Estoppel, Cent. Dig. §§ 245–247, 276–284; Dec. Dig. ☞94.]

15. ESTOPPEL ☞94 — GROUNDS —ACQUIESCENCE.

Where an auctioneer, holding a mortgage note in pledge secured by land which he was selling, but without knowledge of the fact, sold such land as free of incumbrances, there was no duty upon him to proceed against the price of the sale to collect his note, since such duty could have rested only upon him if he had known that the property which he sold was the one on which he had a mortgage, and he, as a mortgage creditor, was also without right to proceed

against the price of a private sale of the mortgaged property.

[Ed. Note.—For other cases, see Estoppel, Cent. Dig. §§ 245–247, 276–284; Dec. Dig. ⊕➡94.]

16. AUCTIONS AND AUCTIONEERS ⊕➡10 — SALES—ACCOUNTING FOR PROCEEDS.

Where an actioneer sold land under one of several mortgages given through straw owners by the owner to defraud purchasers at the sale, the 10 per cent. of the price which the auctioneer received had to be accounted for by him to the purchasers either by way of offset against the mortgage note, secured by the land, which he held without knowledge of the fact when he sold the land.

[Ed. Note.—For other cases, see Auctions and Auctioneers, Cent. Dig. §§ 44–47; Dec. Dig. ⊕➡10.]

O'Niell, J., dissenting.

Appeal from Civil District Court, Parish of Orleans; T. C. W. Ellis, Judge.

Actions by Peter Gallagher against James M. Conner; by Mrs. Margaret Birchmeyer against James M. Conner; by Mrs. Georgiana Richard against Paul B. Habans; by E. F. Schroth, tutor, against James M. Conner; by Mrs. Elizabeth Schneider against the Recorder of Mortgages and others; and by I. D. Stafford against Joseph B. Berner and others. The suits were consolidated. Decrees for defendants, and plaintiffs appeal. Decrees set aside, and cases remanded.

Charles I. Denechaud and W. J. Waguespack, both of New Orleans, for appellant Stafford. J. B. Rosser, Jr., of New Orleans, for appellant Birchmeyer. Hall, Monroe & Lemann and Andrew M. Buchmann, all of New Orleans, for appellant Richard. Merrick, Gensler & Schwarz, of New Orleans, for appellant Schneider. Dufour & Dufour and George Janvier, all of New Orleans, for appellant Gallagher. G. G. Kronenberger and Walter L. Gleason, both of New Orleans, for appellant Leche. Buck, Walshe & Buck, Dinkelspiel, Hart & Davey, Frank N. Butler, McCloskey & Benedict, E. J. Thilborger, A. J. Peters, George B. Smart, W. W. Wright, and Suthon & Loomis, all of New Orleans, for appellees property owners and their warrantors in title.

PROVOSTY, J. In this matter three mortgages accompanied by vendor's privilege, and two not so accompanied, each resulting from a separate notarial act, are sought to be enforced in as many suits, consolidated herein, upon a square of ground in this city, which since the date of the latest of these acts was sold in separate lots, and is now so held by the parties who are the defendants in this suit, fifteen in number.

This square of ground originally belonged to the Berner heirs, six in number, who inherited same from their parents. At a judicial sale made to effect a partition among them it was adjudicated to James M. Conner. He at once sold it to five of the same Berner heirs, accepting from them, in part payment of the purchase price, their note for $3,500, secured by mortgage and vendor's privilege on the property. This note, or, as is claimed by defendants, a forged duplicate of it, was on the same day, August 5, 1903, negotiated by the notary before whom the act of sale was passed, Robert Maloney, to I. D. Stafford, who is now suing upon it.

The Berner heirs sold the property to Charles M. Fulton. On the day on which this sale to Fulton was passed, October 13, 1904, the same Robert Maloney, concocted a certificate of cancellation of the mortgage which, as just stated, had been negotiated by himself to Stafford, and, on the strength of this certificate, procured the cancellation of the inscription of the Stafford mortgage from the public record.

On February 16, 1905, Fulton sold the property to Harry Maloney; and the latter, on August 18, 1905, sold it to Paul Habans. The price of the latter sale was $15,000, represented by the three notes of the purchaser of $5,000, each, secured by mortgage and vendor's privilege on the property. These notes were on the next day negotiated by Robert

Maloney to Mrs. Georgiana Richard, who is now suing upon two of them; the third having been paid.

Habans, on April 3, 1907, sold the property to the same James M. Conner, who had sold it to Fulton. In part payment of the price, Conner made his note secured by mortgage and vendor's privilege on the property. Robert Maloney pledged this note on October 29, 1907, to Peter J. Gallagher, who now brings suit upon it, less a credit of $3,000.

On the day of this sale, Robert Maloney concocted and issued a fraudulent certificate of the cancellation of the mortgage theretofore transferred to Mrs. Richard; and, on the strength of this certificate, procured the cancellation of the inscription of this Mrs. Richard mortgage from the public record.

On May 17, 1907, Conner executed a mortgage upon the property in favor of E. F. Schroth, tutor of the minor Sebastian Schroth, to secure a note of same date executed by himself for $1,500. The tutor is now suing on this note.

On August 13, 1907, Conner executed a mortgage upon the property to secure a note for $2,500 made by himself. Maloney negotiated this note, and also a duplicate of it forged by himself to Mesdames Elizabeth Schneider and Margaret Birchmeyer, who are now suing upon the notes, and, being unable to determine which is the genuine note, have agreed to consider themselves joint holders of the two.

In the latter part of 1907 the square of ground was sold by Conner at public auction in separate lots to fifteen different persons; and these persons now figure in this suit either as present owners of some of the lots or as having been called in warranty by some of the present owners. Previous to this property being thus offered at auction Robert Maloney, by means of fraudulent certificates of cancellation made by himself as notary, had procured the cancellation of the inscriptions from the public record of all mortgages not theretofore canceled; and the persons buying at the auction did so upon the faith of a clear record, after having had the title to the property duly examined and reported on by competent counsel.

[1] The defendants contend that, tacit mortgages having been abolished, and mortgages being required to appear of record in order to affect third persons, they, as third persons, cannot be affected by the said mortgages whose inscriptions had been canceled from the public record at the time they accepted title to the property.

The answer to that contention is that the cancellations were made fraudulently, without the consent of the mortgagees; and therefore can have no effect. Macarty v. Landreaux, 8 Rob. 130; De St. Romes v. Blanc, 20 La. Ann. 424, 96 Am. Dec. 415; Horton v. Cutler, 28 La. Ann. 331; Mechanics' Building Ass'n v. Ferguson, 29 La. Ann. 548; Levy v. Desposito, 133 La. 126, 62 South. 599. In all these cases, except the first, the mortgages had been fraudulently canceled, and third persons had acquired the property in good faith, relying, like the defendants, upon a clear record.

[2] Next, defendants contend that the mortgages held by plaintiffs were infirm in their origin, and that, a mortgage not being negotiable, the transferee acquiring no better right than the transferer had, they have continued so.

This infirmity is said to have resulted from the fact that Conner, Fulton, Harry Maloney, and Habans, in whose names this property stood when these mortgages were created, were mere persons interposed—straw men—lending the use of their names to Robert Maloney, who was the true owner.

The argument is that Maloney, the perpetrator of the frauds which have brought on this litigation, could not recover on these notes if he were the plaintiff in this suit, and that his transferees have no better right.

This argument, it will be observed, is pred-

icated on the supposed fact of Maloney having been the owner of this property. But, when that fact was sought to be established, defendants objected to the admission of the evidence, on the ground that the defendants held title under the said Conner, Fulton, Harry Maloney, and Habans, and that a party cannot impugn the title under which he holds. Rocques' Heirs v. Levecque's Heirs, 110 La. 306, 34 South. 454. This objection was overruled, and the said fact was established; but the objection should have been sustained, for the said legal proposition upon which it is based is one which can be neither controverted nor qualified.

[3] But, on the assumption of the said fact having been duly established, are the defendants any better off? What is then the situation? It is that an owner has created successive mortgages upon his property through successive persons interposed, after having fraudulently caused the preceding mortgage to be canceled to make room for each succeeding one. Upon such a condition of facts as this, what are the rights of the holders of the mortgage paper? Nothing can be plainer than that their rights are perfect, except, of course, that the several mortgages must take rank in the order in which they were created and recorded. This owner could never be allowed to gainsay his own act in creating the mortgages, and no subsequent owner of the property would be in any better position to do so; for such subsequent owner would, of course, take the property in the condition in which it was—i. e., burdened with the mortgages.

[4] Defendants attach great importance to the fact that in such a case the mortgage paper would have been mere paper, with no vitality, so long as it had remained in the hands of Maloney; but that fact is utterly insignificant. An owner may make a mortgage in favor of a mere nominal mortgagee (Schepp v. Smith, 35 La. Ann. 1), or may even

138 LA.—21

dispense altogether with a present mortgagee, and consent a mortgage in favor of any future holder of a note he has made to his own order and secured by the mortgage (Phelan v. Wilson, 114 La. 813, 38 South. 570), and, of course, what he can thus do directly in his own name, he can do indirectly through some person interposed (Thompson v. Whitbeck, 47 La. Ann. 49, 16 South. 570). By no act of his subsequent to the negotiation of this mortgage paper could this owner, or the person interposed, affect in the slightest degree the rights of the holders of the paper. As against these holders, they could no more create rights or equities in favor of third persons, no matter how very innocent and cautious these third persons might be, than in favor of themselves. In other words, if the mortgages were good at the time they were negotiated, they continued so, regardless of any subsequent practices of the mortgagors.

[5] Next, defendants argue that the plaintiffs purchased this mortgage paper without having caused the record to be examined, and without investigation aliunde the record, in blind confidence in Maloney, whereas, defendants were duly cautious, and consented to purchase this property only after competent counsel had examined the title and found it to be good and clear, and that therefore the plaintiffs are in greater degree responsible for the loss than they are, and should be made to support it, on the principle that a loss which one of two innocent persons must bear should be made to fall on that one who contributed most to its occurring.

This argument is the weakest of all. In the first place, equity has nothing to do with the case. Equity can be invoked only in the absence of positive law; and this case is governed by legal principles firmly established in our jurisprudence. In the next place, if the plaintiffs had examined the record, they would have found it in the same condi-

tion of clearness in which the defendants found it; and, so far as confidence in Maloney or investigating him or his note transactions, is concerned, the defendants are viewing the situation from the standpoint of what is now known, and not from that of what was then known. At that time Maloney was conducting a very large and apparently flourishing law and notarial business, and enjoyed the fullest public confidence. As well would one think of investigating one of the banks of this city before consenting to purchase a mortgage note from it as one would have thought then of investigating Maloney before purchasing a note from him.

[6] Defendants urge also that these frauds of Maloney's were committed not upon them, who at that time were entire strangers to the property, but upon the mortgage creditors, and that the latter, therefore, should be the ones to suffer.

In this suggestion we find no force whatever. There can be no doubt that the persons upon whom the frauds were committed were those who, coming to deal with the property subsequently to their commission, were by them misled to their prejudice. It did not lay in the power of Maloney to affect the rights of those who had already dealt with the property; hence these parties were not the ones who were defrauded.

This disposes of the defenses made to the mortgages in general, and brings us to the consideration of the defenses made to some of the notes in particular.

The note held by Stafford is said not to be the genuine note; the genuine note is said to have been paid by the makers of it, the Berner heirs.

[7] Stafford confided his note to Robert Maloney, and never got it back; and his suit is via ordinaria, as on a lost instrument, against the Berner heirs for a personal judgment and for recognition of his rights of mortgage. Maloney testified that there never was but one note, that, as the signatures to the note were to be numerous, and the ordinary printed form for notes would not afford room for them all, a typewritten note was made on a larger sheet of paper, and that in all probability, when his papers came to be destroyed, this typewritten note was mistaken for an ordinary piece of paper, and was destroyed with the other papers. Leclerc, Maloney's clerk, gives the same description of the note. Joseph Berner, one of the makers of the note, testified that it was "an ordinary mortgage note"; but he can hardly have meant by this to contradict Maloney and Leclerc, for he testified elsewhere that he did not remember what kind of note it was. The note was signed by Joseph and Emile Berner, and by three women and their husbands—eight in all. Stafford testified that his note was signed by "six or seven different people," among whom were Joseph Berner and his wife; that it bore interest "at 7 per cent.; it may have borne at one time 8, but I think the interest on it was reduced." The witness stated that he was not certain on this question of interest. The note was, of course, fully described in the mortgage act. Its loss was duly advertised; and, notwithstanding this publicity, and the still wider publicity attending the Maloney defalcation which could not have failed to reach and to stir up every person holding a note derived from Maloney, no duplicate note has ever turned up. We find no good reason to hold that this note, which was negotiated to Stafford on the very day of its execution, was a forgery; and we pass to the question of its having been paid.

[8] The facts in that connection are that, when the Berner heirs sold the property to Conner on October 13, 1904, they left in the hands of Robert Maloney, before whom, as notary, the act of sale was passed, an amount of money sufficient to pay the note, but that this money was never paid to Stafford, who

held the note; that on August 5, 1904, 1905, and 1906, Stafford presented the note for payment at Maloney's office, and on each of these occasions consented to receive from Maloney payment of only the interest and extend the payment of the principal one year; that in June, 1907, Maloney having discovered that Stafford was about to leave for Europe, to be gone until November, induced him to deliver the note to him for collection or renewal, by falsely and fraudulently representing that the Berner heirs desired to sell the property and make a partition, and that, as the settlement would be made during Stafford's absence, it would be necessary that he (Maloney) should have the note for that purpose; that Stafford, on his return from Europe, in November, 1907, called on Maloney for the note, but was told by the latter that the heirs had not as yet made the partition, and hence it was necessary for him to keep the note longer; that Maloney paid at that time the interest due August 5, 1907; that Stafford called on Maloney repeatedly thereafter for the note, but was put off on the same excuse; that Maloney, when his defalcation became known, informed Stafford that he did not know what had become of the note: that he had either destroyed or lost it.

Upon these facts it is contended that, as Maloney was the joint agent of the parties for the payment and the collection of the note, the law imputes a payment, citing 39 Cent. Dig. Vo. Payment, § 17, and O'Conner v. Bernard, 6 Mart. (N. S.) 572.

We cannot adopt that view. Evidently a payment can be thus imputed only when the reception of the mandate to collect and the reception of the money wherewith to make the payment coincide. Not, as in this case, where the mandate to collect is received after the agent has embezzled the fund, and no longer holds it for making the payment. Under the latter circumstances, an imputed payment could only be purely fictive; and, if one were allowed, the operation would be not a collection, but simply an extinguishment of the debt, or a novation of it by which it would be converted from one due by the maker of the note into one due by the agent.

"A power to collect can be exercised in no manner short of an actual collection of the money." 31 Cyc. 1375.

"An agent to collect or receive payment can receive nothing, but money in satisfaction of the claim." 1 A. & E. E. of L. 1027.

Were defendants' contention upheld, Maloney would have received in payment of this mortgage note, not money, but the claim which the Berners had against him for a restoration of the money which he had embezzled some years before.

[9] Against the notes held by Mrs. Richard it is said that Maloney was the agent of Mrs. Richard for investing her money in them; that this agent knew them to be mere shams, and worthless, and that this knowledge is imputable to Mrs. Richard; that, moreover, the notes sued on are not the genuine notes; and, finally, that the notes sued on have evidently been altered, and no recovery can be had on them until the alterations are accounted for.

The facts pertinent to the acquisition of the notes are that Maloney was at one time the agent in charge of Mrs. Richard's affairs, and that, when he was succeeded by another agent and was called upon for an accounting, he turned over the notes in question, as representing an investment of a like amount of the funds of Mrs. Richard. This accounting took place on August 19, 1905—the day after the execution of the notes.

To this condition of facts what we have already said as to the right of an owner to create mortgage paper by a unilateral act, or to do the same thing through the interposition of another person in whose name he has put the record title of his property, applies. These notes were shams and worthless only so long as they remained in the hands of

the makers of them; but they were susceptible of becoming perfectly good and valid by negotiation. See in that connection the decisions hereinabove cited and the cases cited in them.

For saying that these notes are not genuine, defendants rely upon the fact that, whereas the genuine notes are described in the act of mortgage as payable at the "Teutonia Bank & Trust Company," the notes sued on appear on their face to be payable at the "Teutonia Trust & Banking Company." Defendants here are merely catching at a straw, and a flimsy one at that.

[10] The alterations in the notes are said to consist in that the word "Two," in the phrase "Two years after date," has been written over some word that has been erased. The notes are identified by the notary's paraph with the act of mortgage, and answer the description given of them in the act. This is sufficient.

The notes held by Mesdames Birchmeyer and Schneider may be dealt with together. They are said not to be the notes identified with the act of mortgage. One of them is not, but which one it would be hard to tell. The contention that neither is is based upon trifles light as air, useless to be mentioned, since none but an overzealous mind could treat them seriously.

And the same may be said of the objections to the note sued on by the minor Schroth.

[11, 12] A further defense urged against this note is that the mortgage act with which it is identified is not authentic; it not having been passed in the presence of two witnesses. This nonauthenticity can make no difference, since a mortgage may be validly consented by act under private signature (C. C. art. 3305), and may be validly recorded without previous acknowledgment of signature. Succession of Elliott, 31 La. Ann. 37.

[13, 14] As to the $15,000 note claimed by Gallagher, now reduced to $12,000, the evidence shows that it is so held in pledge to secure a $6,000 debt of Maloney's to him; that Maloney pledged it to him in order that he might in turn pledge it to a bank as collateral for a loan made to him by the bank on his note, but for Maloney's use and sole benefit. The loan by the bank was at first secured by the pledge of two notes of Maloney's father. Later one of these was retired, and from the proceeds of it the debt to the bank was reduced to $6,000. The other was returned to Maloney, at his request, and the note now sued on was substituted for it.

Gallagher is an auctioneer, and it was he who, in said capacity, made the auction sales to the defendants and their predecessors in title. At the time he made these sales the note sued on was being held in pledge by him. But he testifies that he knew nothing about the title to this property, and did not know that it was upon it that the mortgage which secured the pledged note, rested. He testifies further that he made no announcement in regard to whether the property was being sold free of incumbrances; but that such was necessarily the assumption, in the absence of any announcement to the contrary. There is in this state a statute reading as follows (section 171, R. S.):

"It shall not be lawful for any auctioneer, or person acting as such, to sell any real estate without first producing and reading a certificate of mortgage, showing the mortgages and incumbrances recorded against the property offered, under a penalty of five hundred dollars for each offense, to be recovered by the purchaser."

Gallagher testified that it is not customary to procure and read such a certificate except for judicial sales; and that, as this particular auction sale was a private sale, he did not read any certificate.

Gallagher had an open account with Maloney, on which Maloney was largely indebted to him. The adjudications at the auction were made subject to examination of title, and for binding the sales the adjudicatees deposited 10 per cent. of the price. This

10 per cent. was received by Gallagher, and credited to his open account with Maloney.

Upon these facts it is contended that Gallagher is estopped from now seeking to enforce upon the property which he thus sold free of incumbrances a mortgage which he himself held at the time he made the sales, and that, at any rate, his proper remedy would have been to claim the proceeds of the auction sales, and not to come against the property.

On the question of estoppel it is clear that, if by procuring and reading a certificate of mortgages, as he was in duty bound to do, Gallagher would have advised the defendants of the existence of this mortgage, he would now be estopped from setting up this mortgage. But, inasmuch as a certificate of mortgages, if read at the sale, would but have seemed to confirm the defendants in their belief of the property being free of mortgage, there can be no estoppel, since the failure to read this certificate exercised no influence whatever upon the action of the defendants.

The functions of Gallagher consisted simply in crying the property, adjudicating it, receiving from the adjudicatees 10 per cent. of the price, and giving them a receipt for the amount thus received, reciting what it was received for. The actual selling of the property, or, in other words, the execution of an act of sale, did not fall to him. The adjudicatees were to consummate the sale only after they had caused the title to be examined and found good and clear; and the acts of sale were executed only after this had been done, and they were executed by Conner.

Hence there is no so-called estoppel by deed; and, if there is to be any estoppel at all, it will have to be one en pais, or the so-called equitable estoppel. But, in order that the latter kind of estoppel should exist, the party invoking it must show that he was misled to his prejudice by the act or conduct upon which he seeks to found the estoppel.

From Pomeroy on Equity (2d Ed.) § 812, we take the following:

"Whatever may be the real intention of the party making the representation, it is absolutely essential that this representation, whether consisting of words, act, or silence, should be believed and relied upon as the inducement for action by the party who claims the benefit of the estoppel, and that, so relying upon it and induced by it, he should take some action. The cases all agree that there can be no estoppel unless the party who alleges it relied upon the representation, was induced to act by it, and, thus relying and induced, did take some action."

For concluding to accept title and pay the price the defendants relied in no way, shape, or form, not in the slightest degree, upon any representation made by Gallagher, either by his silence or otherwise, and they were not thereby misled in any way, shape, or form, not in the slightest degree, but they relied solely and exclusively upon the careful examination of the record which they had caused to be made.

An owner who stands by and remains silent while his property is being sold to a purchaser in good faith who believes the seller to be the owner is thereafter estopped from asserting title to the property. 16 Cyc. 764. But this holds good only when the stander-by is aware at the time that the property which is being sold is his, and remains silent knowingly. 16 Cyc. 764. In this case Gallagher, as a matter of fact, was on that occasion as ignorant and as innocent as the defendants themselves. His omission, therefore, as the holder of this mortgage, or, in other words, as an individual, to give notice of its existence affords no ground for estoppel against him; and the question must be whether his omission as an officer to do so affords such ground.

It does, if it was his duty to give such notice, and he failed therein and the defendants were thereby misled to their injury. Was it his duty? What was the extent of his duty in the premises? It was his duty to procure and read a certificate of mort-

gages. But we have seen that no causal connection whatever exists between the failure to procure and read such a certificate and the loss suffered by the defendants, since, if he had read such a certificate, it would but have confirmed the existing impression of the property being free of mortgage. Was it his duty to inform himself dehors the record, and give to the defendants the benefit of this information? We know of no law imposing that duty upon him. If an officer fulfills every duty imposed upon him by law, and is honest in the discharge of his functions, there should be no fault imputed to him. If he fails in a certain duty, but honestly, he should be made to suffer for the effects of that failure, and no further; if the failure was barren of effect, he should not be mulct at all.

It is said, however, that the law imputes to every man a present knowledge of his affairs; so that every man is juris et de jure presumed to keep in his mind present knowledge of every piece of property upon which he has a mortgage. We know of no such law. The very opposite is the law. A man is estopped only if he knowingly misleads another by his silence; not if he does it unknowingly. All the less is there any ground for imputing such present knowledge in a case like the present one, where, as a matter of fact, the silence complained of misled no one, since the defendants did not rely upon it, but caused the title to be carefully examined, and consented to purchase only after the examiners had made a favorable report.

[15] As to the contention that Gallagher should have proceeded against the price of the sale, it is but a renewal in another form of the contention of estoppel; for the duty so to proceed could have rested upon him only if he had known that the property sold was the one upon which he had a mortgage. The contention is untenable for the further reason that a mortgage creditor is without right to proceed against the price of a private sale of the mortgaged property. The property passes at such a sale subject to his mortgage, and his recourse is against the property.

[16] The 10 per cent. of the price which Gallagher received, however, was part of the fruits of a fraud, and necessarily has to be accounted for by him, either by way of offset or otherwise.

We conclude that all the mortgage rights of the plaintiffs continued to exist just as if their inscriptions had not been canceled, and are entitled to be recognized and enforced accordingly. For the doing of this we will remand the case, as the proceeding is attended with many details which cannot be threshed out on this appeal.

The judgments appealed from are therefore set aside, and the cases are remanded to be proceeded with in accordance with the views herein expressed, and according to law; the appellees to pay the costs of this appeal.

MONROE, C. J., takes no part.

See dissenting opinion of O'NIELL, J., 70 South. 546.