Dale DRESSEL, Appellant,

v.

Marion S. WEEKS, Shirley Craft, personal representative of the Estate of Dorothy Kuhns, deceased, Appellees.

No. S–2580.

Supreme Court of Alaska.

Aug. 18, 1989.

Kenneth P. Ringstad, Rice & Ringstad, Fairbanks, for appellant.

David H. Call, Call, Barrett & Burbank, Fairbanks, for appellees.

Before MATTHEWS, C.J., and RABINOWITZ, BURKE, COMPTON and MOORE, JJ.

MOORE, Justice.

In this case, we address the quantum of proof required to establish a claim for the conversion of an indeterminate amount of cash and the application of the doctrine of quasi estoppel to a real property dispute. The trial court held that Craft had borne her burden of proving damages on the conversion claim, and that quasi estoppel could be applied to preclude Dressel from asserting his legal title to the real property. We affirm.

## I. FACTS

Dorothy Kuhns (Kuhns) met Dale Dressel (Dressel) in 1979. Soon thereafter they began to live together in Kuhns' Fairbanks home. Kuhns was fairly wealthy, and she kept large amounts of cash in her bedroom safe. Kuhns never told Dressel the combination of the safe. Dressel had a limited education, and read and wrote poorly. While they lived together (until Kuhns' death in 1985), Dressel gave his paychecks to Kuhns. She cashed them and used the cash on their joint living expenses. Dressel placed great faith in Kuhns in all business and financial matters, and he generally acquiesced in her actions in these areas.

In 1980, Kuhns sold Dressel a cabin she owned, with surrounding acreage. She executed a warranty deed to Dressel, which he recorded on November 5, 1980. Dressel gave Kuhns a promissory note for the amount owed, a provision of which note stated that the note "shall be deemed fully paid and satisfied should Dorothy L. Kuhns die before maturity of the note."

Prior to the summer of 1983, Kuhns and Dressel agreed that Kuhns would "take back" the cabin from Dressel and in return she would bequeath to him the house they lived in.[1] This agreement was not put in writing. For reasons unknown, Kuhns failed to have Dressel deed the cabin back to her.

Marion S. Weeks (Weeks) purchased the cabin from Kuhns on October 12, 1983 for $60,000. Prior to purchasing, Weeks purchased a title insurance policy. The preliminary title report failed to show the deed from Kuhns to Dressel and thus showed Kuhns as the legal owner. Dressel was aware of the impending sale, but he never asserted an interest in the property. He was present at the closing of the sale and did not object. On various occasions after the sale, Dressel indicated that he did not believe he had any remaining interest in the cabin. For example, he told others that the cabin used to be his. Weeks recorded her deed from Kuhns on October 13, 1983.

After 1983, Dressel did not work and did not receive any paychecks. In 1984, Kuhns went to Las Vegas, where she was robbed. Kuhns called Theresa Heim, her granddaughter, and asked her to go to Kuhns' home, get all the cash from her safe, and wire it to her. Ms. Heim did so, and she testified that she emptied the safe of cash that night.

Kuhns executed her last will on March 14, 1984. She died on June 25, 1985. In her will, she left her home and all its furnishings to Dressel. On the evening of Kuhns' death, Theresa Heim, her husband John, and one other person went to Kuhns' former home. Dressel was there, grieving. When Dressel stepped outside briefly with one of the visitors, Theresa Heim went into the bedroom and began to open Kuhns' safe. Heim had been instructed by Kuhns to retrieve the safe's contents upon Kuhns' death and deliver them to Kuhns' executor, Shirley Craft. Dressel returned to the

---

1. At the time of Kuhns' death in 1985 the house was valued at $159,091 and had no encumbrances on it.

house while Heim was opening the safe. A scuffle ensued because Dressel thought Heim was making an unauthorized entry into Kuhns' safe. Heim opened the safe and removed its contents as Dressel discussed the situation with the two male visitors. The safe contained Kuhns' will and an envelope with cash in it.

John Heim opened the envelope with the cash in it and took two photographs of the cash as it lay on a counter top. No one counted the cash at the time. Theresa and the two men left with the will, leaving the cash in Dressel's possession. Dressel subsequently spent the cash. At a later deposition, he testified that he never counted the cash. At trial, however, he testified that he counted it, that it totalled $5,050, and that the bills were all $100 bills except for one $50 bill. Dressel admitted having told Kuhns' executor that there was $25,-000 in cash, but he testified that that figure was not the result of an actual count.

Shirley Craft filed suit to recover the cash and to have Dressel deed the cabin to Kuhns' estate. Weeks joined suit as a third-party plaintiff, seeking to quiet title to the cabin. Dressel asserted his recorded legal title to the cabin in defense and as a counterclaim.

Trial was held without a jury. At trial, Craft introduced the photographs of the money into evidence, and a courtroom demonstration occurred in which 250 new $1 bills were put into an envelope similar to the one in which the cash in the safe had been.

The trial court, Judge Mary Greene presiding, entered judgment in favor of Craft for $10,000, concluding that "at least $10,-000" had been converted. The court entered judgment in favor of Weeks, quieting her title to the cabin. Dressel appeals.

## II. CONVERSION

On appeal, Dressel argues that he owned or was entitled to the cash in Kuhns' safe, or that it was given to him in her will, and also that Craft has failed to prove the amount converted with sufficient certainty. Dressel urges that a fiduciary relationship existed between Kuhns and Dressel and that if Kuhns' estate is unable to account to Dressel for all the paychecks Kuhns received from him, then the estate should bear the loss of the cash.

The trial court found the evidence insufficient to establish the existence of a fiduciary relationship. We need not address this question, since Dressel has cited no authority for the proposition that, fiduciary relationship or not, Kuhns' failure to account would entitle Dressel to keep the cash.

■ Dressel has also failed to prove that the cash was his. The evidence showed that Dressel did not receive any paychecks after 1983, that the safe was emptied of cash by Theresa Heim in 1984, and that Dressel did not have the combination to the safe. We are not left with the "firm and definite conviction on the entire record that a mistake has been made." Thus, the trial court's factual finding that the cash belonged to Kuhns' estate is not clearly erroneous, and it is therefore affirmed. *Hebert v. Bailey*, 672 P.2d 1307, 1310 (Alaska 1983).

■ Dressel argues that Kuhns intended the cash to pass to him under the provision of her will leaving him the house and "all furnishings therein." The trial court implicitly rejected this argument, finding that the cash belonged to Kuhns' estate and that Dressel had converted it.

The evidence showed that Kuhns instructed Theresa Heim to remove the safe's contents and deliver them to Shirley Craft upon Kuhns' death. Dressel cites no persuasive authority for the proposition that "furnishings," as a matter of law or fact, includes the contents of a safe. The trial court's holding on this point is affirmed.

Dressel argues that Craft has not proven the amount of damages with sufficient certainty. Based on testimony, the in-court experiment, and the photographs of the money, the trial court concluded that "at least $10,000" had been left on the counter, and that Craft had met her burden of

proof. We review this conclusion *de novo.*[2] *Langdon v. Champion,* 752 P.2d 999, 1001 (Alaska 1988).

█ The tort of conversion is "an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel." *McKibben v. Mohawk Oil Co., Ltd.,* 667 P.2d 1223, 1228 (Alaska 1983) (quoting Restatement (Second) of Torts § 222A (1965)).

"Damages in an action of conversion generally are measured by the value of the item at the time it was converted plus interest." *Rollins v. Leibold,* 512 P.2d 937, 944 (Alaska 1973). "The rule against recovery of uncertain damages is ... generally directed against uncertainty with respect to the cause of rather than the extent of damages. However, some competent evidence as to the amount of damages must still be introduced." *Dowling Supply & Equip., Inc. v. City of Anchorage,* 490 P.2d 907, 909 (Alaska 1971) (breach of contract claim; lost profits). "Although there may be some uncertainty respecting the amount of damages sustained, it is enough if the evidence presented is sufficient to enable the court to make a fair and reasonable approximation." *Newman v. Basin Motor Co.,* 98 N.M. 39, 45, 644 P.2d 553, 559 (App.1982) (affirming damages for conversion of truck trailer). *See also Henderson v. For-Shor Co.,* 757 P.2d 465, 469 (Utah App.1988); 22 Am.Jur.2d *Damages* §§ 22–25 (1965).

In *Dowling,* this court agreed that there was no evidentiary basis for the jury's verdict of $2,416 in lost profits, where

[t]he only evidence concerning damages introduced below consisted of testimony ... that a sharp decrease in gross receipts occurred after removal of the telephone and that the total "business injury" exceeded $3,000. No indication of profit margin was given; no business records were introduced. We hold that

the trial court did not err in finding the foregoing testimony insufficient to support an award of compensatory damages.

490 P.2d at 909–10. In *Matson v. Lewis,* 755 P.2d 1126 (Alaska 1988), this court reversed the trial court's valuation of a pension where the ruling reflected

the fact that the trial court arrived at the valuation by averaging the estimate of Matson's expert with the estimate given by Lewis in argument, which was unsupported by any evidence. The trial court did not conclude that any particular discount rate was appropriate. We remand ... to the trial court to arrive at a valuation in a manner which is supported by the record.

755 P.2d at 1129.

█ In this case, Dressel testified that he counted the cash and that there was $5,050,[3] and that the bills in the envelope were all $100 bills except for one $50 bill. Two photographs were taken of the cash spread on the counter and were introduced into evidence. An in-court demonstration occurred, with a similar envelope and 250 new $1 bills, from which the court concluded there could not have been 250 bills left on the counter.

There was no question here about the cause of the damage. "Some competent evidence" was introduced, from which the court could make a "fair and reasonable approximation" of the amount converted. The photographs, combined with the testimony that all of the bills except one were $100 bills, take the court's finding out of the realm of speculation. Having rendered proof of the exact amount converted impossible by spending the money, Dressel should not be allowed to escape liability on the grounds of inexact proof. We hold that the evidence Craft introduced at trial was sufficient, as a matter of law, to meet her burden of proof of the amount of damages. The trial court's ruling on this point is affirmed.

2. Having viewed the photographs of the cash, we find that the trial court's conclusion as to the amount converted was not clearly erroneous. We review *de novo* whether an award of dam-

ages for conversion may be based upon a finding of the "least" amount that was converted.

3. Judge Greene did not believe this testimony.

## III. ESTOPPEL

The dispute over title to the cabin raises the issues of whether the doctrines of quasi estoppel and equitable estoppel may be applied to divest title to real property. Weeks, believing that Dressel's record title precluded application of equitable estoppel, urged the application of quasi estoppel. Judge Greene ruled that quasi estoppel precluded Dressel's assertion of title to the cabin.

Judge Greene's ruling was based on her conclusions of law that Dressel's actions and inactions in the face of the sale were tantamount to fraud in light of his later claim to title and that the facts and circumstances made his assertion of title unconscionable. Dressel argues that the application of quasi estoppel to real property does not foster reliance on record title, enhance marketability or promote simplicity and certainty in title transaction. We review this question of law under our independent judgment. *Guin v. Ha,* 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

 Quasi estoppel "precludes a party from taking a position inconsistent with one he [or she] has previously taken where circumstances render assertion of the second position unconscionable." *Jamison v. Consolidated Util., Inc.,* 576 P.2d 97, 102 (Alaska 1978).[4] We have stated that equitable estoppel, on the other hand, requires "the assertion of a position by conduct or word, reasonable reliance thereon by another party, and resulting prejudice." *Jamison,* 576 P.2d at 102.

 Courts "have proceeded with considerable caution and restraint when the effect of raising an estoppel would be to take the title to land from one person and vest it in another." *City of Long Beach v. Mansell,* 3 Cal.3d 462, 91 Cal.Rptr. 23, 42, 476 P.2d 423, 442 (1970). When applied to preclude the assertion of title to real property, equitable estoppel has been held to require

> *first,* that the party making the admission by his declaration or conduct, was apprised of the true state of his own title; *second,* that he made the admission with the express intention to deceive, or with such careless and culpable negligence as to amount to constructive fraud; *third,* that the other party was not only destitute of all knowledge of the true state of the title, but of the means of acquiring such knowledge, and *fourth,* that he relied directly upon such admission, and will be injured by allowing its truth to be disproved.

*Biddle Boggs v. Merced Mining Co.,* 14 Cal. 279, 367–68 (Cal.1859), *quoted in City of Long Beach,* 91 Cal.Rptr. at 43, 476 P.2d at 443. *See United States v. Georgia–Pacific Co.,* 421 F.2d 92, 95–97 (9th Cir.1970); *First Federal Savings & Loan Ass'n of Toledo v. Perry's Landing, Inc.,* 11 Ohio App.3d 135, 463 N.E.2d 636, 646–48 (1983). The proponent of an equitable estoppel as to realty must prove each element by clear and convincing evidence.[5]

---

**4.** In *Jamison,* we stated:

> The essence of the doctrine of quasi-estoppel is the existence of facts and circumstances making the assertion of an inconsistent position unconscionable. This determination is essentially a factual one and ... will not be disturbed on appeal unless the findings on which it is based are clearly erroneous.... Among the many considerations which may indicate that an inconsistent position is unconscionable and the doctrine of quasi-estoppel should be applied are whether the party asserting the inconsistent position has gained an advantage or produced some disadvantage through the first position; the magnitude of the inconsistency; whether changed circumstances tend to justify the inconsistency; whether the inconsistency was relied on by the party claiming estoppel to his detriment; and whether the first assertion was made with full knowledge of the facts. Thus, in determining whether the doctrine of quasi-estoppel is applicable to the matter before it, the trial court should consider whether the party asserting the inconsistent position has gained an advantage or produced some disadvantage through the first position; whether the inconsistency was of such significance as to make the present assertion unconscionable; and whether the first assertion was based on full knowledge of the facts.

576 P.2d at 102–03.

**5.** *See Curran v. Mount,* 657 P.2d 389, 391–92 (Alaska 1982); *Jackson v. White,* 556 P.2d 530, 534 (Alaska 1976); Comment Note; *Quantum or Degree of Proof Required to Prove an Equitable Estoppel,* 4 A.L.R.3d 361 (1965).

The essence of equitable estoppel is the prevention of actual or constructive fraud and the doctrine, like all equitable doctrines, is subject to consideration of the facts and circumstances of each case and should not be applied in an overly rigid manner.[6]

Equitable estoppel is the estoppel normally applied to real property disputes because it gives effect to the policies embodied in the recording acts. Alaska's recording act, AS 40.17.010–40.17.900, charges purchasers of real property with "constructive notice of the contents of" properly recorded conveyance documents. AS 40.17.080(a). A properly recorded title normally precludes an equitable estoppel against assertion of that title due to the requirement that the party raising the estoppel be ignorant of the true state of title or reasonable means of discovering it. *See, e.g., Pierce v. Wagoner*, 115 Ind.App. 430, 59 N.E.2d 572, 574 (1945); *Blue Ridge Marble Co. v. Duffy*, 27 N.E. 430, 431 (Ind.1891); *Fast v. Fast*, 209 Kan. 24, 496 P.2d 171, 175 (1972); *Brungardt v. Smith*, 178 Kan. 629, 290 P.2d 1039, 1045 (1955); *Alvey v. Alvey*, 220 Md. 571, 155 A.2d 491, 493–94 (1959); *Milburn v. Michel*, 137 Md. 415, 112 A. 581, 583 (1921); *Craft v. Everett*, 237 Miss. 360, 115 So.2d 133, 135–37 (1959); *Roberts v. Bookout*, 162 Miss. 676, 139 So. 175, 176 (1932); *Engelhardt v. Gravens*, 281 S.W. 715, 719 (Mo.1926); *Pacific Nat'l Bank of Washington v. Richmond*, 12 Wash.App. 592, 530 P.2d 718, 721 (1975); *Waldrip v. Olympia Oyster Co.*, 40 Wash.2d 469, 244 P.2d 273, 277–78 (1952). *See also Jackson v. Kenai Peninsula Borough*, 733 P.2d 1038, 1041 (Alaska 1987); *State v. Alaska Land Title Ass'n*, 667 P.2d 714, 726 (Alaska 1983), *cert. denied*, 464 U.S. 1040, 104 S.Ct. 704, 79 L.Ed.2d 168 (1984).

We note initially that "an equitable estoppel may exist, notwithstanding that the records disclose the actual state of title." *Dimond v. Manheim*, 63 N.W. 495, 498 (Minn.1895), *quoted in Structural Plastics Corp. v. Walsh*, 281 Minn. 362, 161 N.W.2d 639, 644 (1968). *See, e.g., Bastrup v. Prendergast*, 179 Ill. 553, 53 N.E. 995, 996–97 (1899); *Blackburn v. Piney Oil & Gas Co.*, 278 Ky. 191, 128 S.W.2d 192, 195 (1939); *Virginia Iron, Coal & Coke Co. v. Campbell*, 105 S.W. 129 (Ky.1907); *Poksyla v. Sundholm*, 259 Minn. 125, 106 N.W.2d 202, 204–05 (1960); *Montclair Trust Co. v. Russell*, 135 N.J.Eq. 570, 39 A.2d 641 (N.J.Ch.1944); *Wisconsin Brick & Block Corp. v. Vogel*, 54 Wis.2d 321, 195 N.W.2d 664, 668 (1972); Annotation, *Estoppel of One Not a Party to a Transaction Involving Real Property by Failure to Disclose His Interest in the Property*, 50 A.L.R. 668, at 750–67 (1927); 28 Am.Jur.2d *Estoppel and Waiver* § 97 (1966); 31 C.J.S. *Estoppel* § 90 (1964). The effect of the constructive notice may be overcome by, among other things, "some act of a positive or affirmative quality, which was calculated to produce a wrong impression," *Craft*, 115 So.2d at 136, or "active intervention and procurement" of the sale, even if innocently done. *Thompson v. Simpson*, 128 N.Y. 270, 28 N.E. 627, 632 (1891).

The facts of this case do not, however, support an equitable estoppel. Dressel, at the time of the sale to Weeks, did not believe that he had an interest in the cabin. Silence may give rise to an estoppel, but "only when the stander-by is aware at the time that the land being sold is his." *Gallagher v. Conner*, 138 La. 633, 70 So. 539, 545 (1915). *See, e.g., City of Long Beach*, 91 Cal.Rptr. at 44 n. 28, 476 P.2d at 444 n. 28; *Geisendorff v. Cobbs*, 47 Ind.App. 573, 94 N.E. 236, 239–40 (1911); *Milburn*, 112 A. at 583; *Roberts*, 139 So. at 176; *Starr v. Bartz*, 219 Mo. 47, 117 S.W. 1125, 1129 (1909); *Harrison v. McReynolds*, 183 Mo. 533, 82 S.W. 120, 125 (1904); *Thompson*, 28 N.E. at 631–32; *Waldrip*, 244 P.2d at 277–78; Annotation, *supra*, 50 A.L.R. at 686–88; 28 Am.Jur.2d *Estoppel*

---

6. "[C]ertain more peripheral and essentially derivative portions of the *Biddle Boggs* formulation are to be viewed in the factual context of that case and are not to be taken as abstract statements of requirements more restrictive than those normally requisite to the application of equitable estoppel." *City of Long Beach v. Mansell*, 3 Cal.3d 462, 91 Cal.Rptr. 23, 43, 476 P.2d 423, 443 (1970). *See* 28 Am.Jur.2d *Estoppel and Waiver* § 26 (1966).

*and Waiver* § 93 (1966); 31 C.J.S. *Estoppel* § 70 (1964).

Dressel's conduct in connection with the sale consisted of silent acquiescence rather than active encouragement or solicitation. As a "general rule ... mere silence or acquiescence will not operate to work an estoppel where the other party has constructive notice of public records which disclose the true facts." *Waldrip,* 244 P.2d at 277. It also appears that Dressel's conduct did not discourage Weeks from conducting a title search, so it is hard to see how she relied on his silence. *See Starr,* 117 S.W. at 1129; *Gallagher,* 70 So. at 545.

It thus appears that none of the requirements for an equitable estoppel were established on the facts that existed at the time Kuhns purported to sell the cabin to Weeks. Dressel did not know of his rights in the cabin. He did not intend to deceive Weeks, who had constructive notice of his title and did not rely on his silence.

However, this does not end our analysis. The most critical fact in this case is that Kuhns performed her promise by leaving Dressel her home. Dressel denies that he and Kuhns had made a contract to exchange the cabin for a remainder in her house, but Judge Greene found its existence proven by clear and convincing evidence. After a review of the record, we are unable to conclude that her finding is clearly erroneous.[7]

Dressel argues that, assuming there was an oral agreement, it was not enforceable because it violated the statute of frauds. Alaska's statute of frauds, AS 09.25.010, prohibits the oral creation of an interest in real property, AS 09.25.010(b),[8] and also prohibits oral promises to make a testamentary disposition. AS 09.25.-010(a)(2).[9] Here, the oral agreement between Dressel and Kuhns was that he would return the cabin to her, and she would leave the house to him upon her death. Clearly, this oral agreement violated the statute of frauds, and without more, would have been unenforceable at law. However, upon Kuhns' death, the house was bequeathed to Dressel by her will, in full performance of her oral promise. He accepted the house as the bargained-for-benefit in exchange for the return of the cabin that Kuhns had previously sold to Weeks. Thus, the parties' full performance of this oral agreement precludes the application of the statute of frauds.[10] *See Carter v. Hoblit,* 755 P.2d 1084, 1088 (Alaska 1988).

In contrast to equitable estoppel, quasi estoppel "does not require ignorance or reasonable reliance as essential elements." *Donaldson v. Le Nore,* 112 Ariz. 199, 202, 540 P.2d 671, 674 (1975), *quoted*

---

**7.** The record shows that Shirley Craft testified at her deposition, which was introduced into evidence, that Kuhns told Craft that Kuhns was taking the cabin back and was planning to leave her house to Dressel. The record also shows that after the sale to Weeks, Dressel told people that he used to own the cabin, clearly indicating that he claimed no interest. It further appears that in the spring of 1986, in a conversation in the presence of Marion Weeks, Dressel admitted that he no longer owned the cabin because it had been turned back to Kuhns. Given the trial court's opportunity to observe the witnesses in determining credibility, Alaska R.Civ.P. 52(a), and the uncontradicted evidence that Dressel was aware of and acquiesced in the sale of the cabin to Weeks, we are unable to conclude that the trial court's finding of fact was clearly erroneous.

**8.** AS 09.25.010(b) provides in relevant part that "no estate or interest in real property ... may be created [or] transferred ... otherwise than by ... a conveyance or other instrument in writing subscribed by the party creating [or] transferring ... it."

**9.** AS 09.25.010(a) provides in relevant part:

In the following cases and under the following conditions an agreement, promise, or undertaking is unenforceable unless it or some note or memorandum of it is in writing and subscribed by the party charged ...:

. . . . .

(2) an agreement the performance of which is not to be completed by the end of a lifetime; this provision includes a contract to bequeath property or make a testamentary disposition of any kind....

**10.** AS 09.25.020 provides in relevant part that "A contract, promise, or agreement which is subject to AS 09.25.010, which does not satisfy the requirements of that section, but which is otherwise valid is enforceable if (1) there has been full performance on one side accepted by the other in accordance with the contract."

*in Jamison,* 576 P.2d at 102. Weeks' resort to quasi estoppel in this case was a result of Dressel's record title. Judge Greene's reliance on quasi estoppel illustrates the doctrine's application to divest title in realty in spite of perfect record title.

 This court has stated its "desire to foster reliance on record title and enhance marketability," *Curran v. Mount,* 657 P.2d 389, 391 (Alaska 1982), and has sought to "promote simplicity and certainty in title transactions." *Sabo v. Horvath,* 559 P.2d 1038, 1044 (Alaska 1976). The public land records provide purchasers and encumbrancers of real property a quick and efficient source of accurate information. Transaction costs are lowered and certainty of title is enhanced. The requirement that purchasers search the public records also allows an unsophisticated landowner to protect his or her interest with one simple filing. Alaska's recording act, which provides certainty to landowners and purchasers, may not be disregarded by a mere showing of inconsistent positions and resulting unconscionability. For quasi estoppel to preclude the assertion of record title, the record owner must have elected, ratified, acquiesced in and/or accepted the benefits of the transaction at issue.

 It is a long-established principle of equity that "no person will be allowed to adopt that part of a transaction which is favorable to him, and reject the rest to the injury of those from whom he derived the benefit." *Austin v. Loring,* 63 Mo. 19, 22 (1876). "It is a plain principle of justice, of right, and of law, that a man can not accept the benefits, and reject the burdens of a transaction." *Goodman v. Winter,* 64 Ala. 410, 434 (1879). By "accepting the proceeds of the sale, or the benefits of the conveyance, [persons] preclude themselves from avoiding it." *Id.*

This doctrine has frequently been applied to real property, and has been classified as a form of quasi estoppel.

It may be that "estoppel," speaking with precision, is the wrong designation, and that in attempting to classify and give names the doctrine we are about to invoke is improperly classified as "estoppel," and that it does not come under that head, but springs from election, ratification, affirmance, acquiescence, acceptance of benefits, or what not. It is classified, however, by lawwriters under the head of "quasi estoppel."

*Hector v. Mann,* 124 S.W. 1109, 1116 (Mo. 1910). The common thread in the numerous cases applying this doctrine to real property is that the party to be estopped has received and accepted the benefits flowing from a transaction or conveyance involving the property at issue. *See, e.g., Goodman,* 64 Ala. at 434–37; *Ions v. Harbison,* 112 Cal. 260, 44 P. 572, 574–75 (1896); *Williams Lake Lands, Inc. v. LeMoyne Development, Inc.,* 108 Idaho 826, 702 P.2d 864, 867–68 (App.1985); *United Fuel Gas Co. v. Jude,* 355 S.W.2d 664, 666–67 (Ky.1962); *McDonald v. Burke,* 288 S.W.2d 363, 367–69 (Ky.1956); *Blackburn,* 128 S.W.2d at 195; *Jones Colliery Co. v. Hall,* 220 Ky. 706, 295 S.W. 1033, 1034 (1927); *Virginia Iron,* 105 S.W. at 129; *Lytle v. Page,* 591 S.W.2d 421, 424–25 (Mo. App.1979); *Hector,* 124 S.W. at 1115–18; *Austin,* 63 Mo. at 22–23; *Bury v. Bury,* 69 Mont. 570, 223 P. 502, 504 (1924); *Moore v. Rochester Weaver Mining Co.,* 174 P. 1017, 1018 (Nev.1918); *Montclair Trust,* 39 A.2d at 642–43; *Hampshire County Trust Co. v. Stevenson,* 114 Ohio St. 1, 150 N.E. 726, 730–31 (1926); *Vann v. Whitlock,* 692 P.2d 68, 71 (Okla.App.1984); *Burke Aviation Corp. v. Alton Jennings Co.,* 377 P.2d 578, 583 (Okla.1962); *Chisum v. Holbrook,* 281 P.2d 957, 960 (Okla.1954); *Hess v. Seeger,* 55 Or.App. 746, 641 P.2d 23, 33–34 (1982); *Alvey,* 155 A.2d at 493. *See generally* 28 Am.Jur.2d *Estoppel and Waiver* §§ 59–60 (1966); 31 C.J.S. *Estoppel* §§ 109, 110(3), 110(5) (1964).

 This benefits requirement, in addition to those discussed in *Jamison,* 576 P.2d at 101–02, satisfies our concern that the recording act not be too easily avoided. One who knowingly [11] accepts the sale pro-

---

**11.** *See* 28 Am.Jur.2d *Estoppel and Waiver* § 60, at 682 (1966) ("Ordinarily, no estoppel arises from the mere acceptance of benefits by a person in the absence of full knowledge of the facts

ceeds or other benefits from a transaction involving property to which he or she holds legal title is no longer deserving of the protection the recording act was intended to provide.[12]

This doctrine does not impair this court's articulated policy of "foster[ing] reliance on record title and enhanc[ing] marketability." *Curran*, 657 P.2d at 391. One who purchases and records his interest may still depend on assured priority vis-a-vis subsequent purchasers of the property. Further, purchasers may still rely on the records to indicate the state or title. The real effect of applying quasi estoppel in these circumstances is to prevent a party from using a formal legal priority system in an inequitable fashion. One who accepts the benefits of an invalid sale of one's property, to the detriment of the purchaser, should not benefit from the fortuity of the purchaser's failure to adequately search the real property records.

■ Here, Dressel gave the cabin back to Kuhns in return for her promise to leave her house to him, and then he stood silently by as Kuhns sold the cabin to Weeks. The sale to Weeks certainly ran counter to the interest in the cabin he now asserts. Dressel's primary benefit from the trade with Kuhns did not actually accrue to him until about two years after the sale to Weeks, and was unenforceable in the interim. But upon her death he did knowingly accept the benefit, a house worth approximately $160,000 and free of debt. Dressel also claims the benefit of the satisfaction upon death clause in his promissory note to Kuhns, which substantially reduces the value of Kuhns' estate.

## IV. CONCLUSION

Accordingly, we hold that the doctrine of quasi estoppel may be applied to divest legal title to real property from the title holder of record where the title holder knowingly benefitted from a transaction involving the property which runs counter to the interest sought to be asserted. These conditions having been satisfied in the instant case, the superior court's ruling is AFFIRMED.

---

and of his rights."). *Cf., Lytle v. Page,* 591 S.W.2d 421, 425 (Mo.App.1979); *Williams Lake Lands, Inc. v. LeMoyne Development, Inc.,* 108 Idaho 826, 702 P.2d 864, 868 (Idaho App.1985).

**12.** The recording act and quasi estoppel differ in that the former serves to set priorities among valid grants from a single grantor, whereas estoppel serves only to show that there was a valid grant. Therefore, a proper application of the doctrine of quasi estoppel where title to real property is involved is not inconsistent with the protections afforded the grantee who records title to real property under Alaska's recording act.