# STRUCTURAL PLASTICS CORPORATION v. M. RICHARD WALSH AND OTHERS.
## TITLE INSURANCE COMPANY OF MINNESOTA, THIRD-PARTY DEFENDANT.

161 N. W. (2d) 639.

September 13, 1968—No. 40,901.

*Smith, Johnson & Persian* and *Gary E. Persian,* for appellant.
*Thiel, Root & Sorenson* and *W. F. Thiel,* for respondent.

Heard before Knutson, C. J., and Nelson, Murphy, Rogosheske, and Frank T. Gallagher, JJ.

MURPHY, JUSTICE.

This is an appeal from an order denying plaintiff's motion for amended findings or for a new trial. Plaintiff, Structural Plastics Corporation, brought the action against the owners of certain realty and the mortgagee, who has since acquired title by foreclosure proceedings, to repossess alleged chattels under a conditional sales contract and to obtain a deficiency judgment against the original owners. The question involved is whether certain courtyard roofs, which were constructed as part of the improvement to realty before the real property mortgage was made, became a part of the realty as to a good-faith mortgagee without actual notice of the claimed interest of the vendor in the conditional sales contract, which was executed and filed after the roofs had been constructed. The vendor and vendee agreed that the property should remain personalty.

From the record it appears that M. Richard Walsh and his wife built an apartment building to be a part of "The Tropic Garden Apartments," which were designed around the concept of affording the occupants a "tropical atmosphere" in the winter months. Each building has an interior courtyard in which there is a swimming pool. The courtyard is heated by a radiant heating system which surrounds the pool. The central courtyards were to be enclosed to serve as an extension of the living quarters afforded by each apartment. The enclosed courtyards were to be an integral part of the buildings and would add to their economic value.

It appears that in the design of the complex the courtyard areas were

treated as a permanent part of the buildings. The entrance to each apartment from the courtyard was through a large, single-pane sliding door, and single-pane sliding windows provided light with a view of the area. Since the court areas would be heated, no provision was made for storm doors and windows. For the same reason the heating, plumbing, and water pipes which served the various apartments were installed only a short distance below the surface of the ground throughout the court areas. Without a heated courtyard, the pipes would probably freeze during a Minnesota winter. While shutting off the hot and cold water pipes would keep the pipes from freezing, the result would be to make the apartments untenantable. The apartments could not therefore be used as a year-round dwelling without this enclosed, heated courtyard.

The construction contract entered into between the owner and the general contractor provided for the construction of the courtyard roofs as part of the total structure. The "Sworn Construction Statement," executed by the contractor and the owner and furnished to the mortgagee, lists this particular part of the construction as "Court Roof-roofing $46,000." Both the owner and contractor represent under oath "that the items mentioned include all labor and material required to complete said building according to plans and specifications."

It appears that provision was made for the permanent attachment of the courtyard roofs to the buildings. Heavy bolts were embedded in the concrete walls and in specially constructed concrete parapets to provide an anchor for the roofs. The roofs were designed to fit the particular buildings. The materials were delivered to the project and the roofs were constructed on the site in the same manner as materials of any other contractor. The plastic panels which cover the framework, except those panels in the center section of the roofs, were riveted together. The roofs were designed to last the life of the buildings, and they were attached in a manner to withstand all of the strains and stresses to which roofs might be exposed.

It is significant to note that the roofs were completed and had become a part of the general structure prior to the execution of the conditional sales contract under which plaintiff claims title. This contract contains the provision that the roofs "shall remain chattels and personal property

at all times * * * but shall not become part of the realty or freehold." Although this contract is dated July 24, 1963, it was executed (November 8, 1963) and recorded (November 12, 1963) after the work had been completed. Plaintiff accepted part payment for its work from the general contractor who was in charge of the construction of the building.

The construction was financed by a mortgage given by defendants Walsh to defendant Berkshire Life Insurance Company. That mortgage was executed and recorded on December 5, 1963. On that date, plaintiff executed and delivered a mechanics lien waiver for $37,350, the exact amount unpaid according to the conditional sales contract. Unlike a general lien waiver for a nominal consideration, plaintiff's waiver acknowledged receipt of the $37,350 from M. Richard Walsh in full payment of all labor and materials for "court covers." It is also significant to note, as indicative of plaintiff's understanding of the nature of its claim, that, on April 17, 1964, it filed a mechanics lien on the premises for the value of an additional layer of plastic sheets furnished to improve the roofs which are now claimed by it to be personalty. It filed an answer in a mechanics lien foreclosure action, alleging that these additional materials were furnished for an improvement to realty.

Defendant Berkshire Life Insurance Company emphasizes that plaintiff made no claim growing out of work, labor, or material contributed to the premises at the time the mortgage was executed and recorded; nor is there any claim that the mortgagee had actual notice that plaintiff claimed the roof structure to be a chattel. On the contrary, the insurance company asserts that it was led to believe by the sworn construction statement and by plaintiff's mechanics lien waiver that the roof structure was a part of the realty secured by its loan and that plaintiff had been fully paid.

Contrary to the claim of plaintiff that the roofs remained personal property securing the lien of its conditional sales contract, the trial court concluded that they became part of the realty, finding that the buildings were constructed around a roofed and heated central courtyard designed to serve as a year-round extension of the living quarters afforded by each apartment and that the roofs could not be removed from the

buildings without doing substantial damage to the real property of which they were a part nor without destroying the identity of the roofs.

■ We direct our attention to plaintiff's claim that its rights under the conditional sales contract are superior to those of the mortgagee, Berkshire, since the mortgage was executed and recorded subsequent to the recordation of the conditional sales agreement.[1]

Much of the discussion contained in the briefs and much of the evidence found in the record bears upon whether the improvement retained its character as personal property or by the construction was transformed and became an integral part of the realty. We gather from plaintiff's brief that it does not contend too strongly that the improvements furnished did not become a part of the permanent structure. Relying on language found in Holt v. Henley, 232 U. S. 637, 34 S. Ct. 459, 58 L. ed. 767, and Detroit Steel Cooperage Co. v. Sistersville Brewing Co. 233 U. S. 712, 34 S. Ct. 753, 58 L. ed. 1166, it argues instead that "it can readily be seen that even though the roof or pool covers are an integral part of the tropical garden motif claimed by the defendants, and even though they are perhaps awkward to remove, these are still not grounds for appropriating them in the face of a valid security agreement entered into in good faith by the plaintiff and which same has been recorded with the Register of Deeds in the county where the property is situate."

This raises the question of the effect of a recorded chattel mortgage or conditional sales contract covering a fixture as notice to a subsequent

---

[1] Plaintiff relies on Minn. St. 1961, § 511.18, subds. 1 and 2, in support of its claim that the conditional sales contract was constructive notice to the mortgagee. The statute provides: "Subdivision 1. Every promissory note or contract of sale, conditioned that the title to the property for or on account of which the same was given shall remain in the vendor, shall be void as to creditors of the vendee and subsequent purchasers and mortgagees of such property in good faith, unless the note or contract, or a copy thereof, or if the contract be oral, a memorandum, signed by the purchaser and expressing its terms and conditions, be filed as in the case of a chattel mortgage.

"Subd. 2. Every such note, contract, copy or memorandum so filed shall be notice to all parties interested of the existence and conditions thereof, until the expiration of six years from the date of filing thereof."

mortgagee of real estate to which it is attached. The authorities which have discussed this issue are too numerous to require citation. Many of them are gathered and discussed in 18 Minn. L. Rev. 812, 817. The numerical weight of authority in those states where the Uniform Conditional Sales Act or statutes of a similar nature are not in force favors the view that such filing or recording is not constructive notice to subsequent mortgagees or purchasers of the realty to which the fixture in question is annexed. The reasoning supporting these holdings is that a prospective mortgagee or purchaser of real estate cannot be expected to search the records relating to personal property since the policy of the law is that instruments relating to real estate should appear in the real estate records. There is substantial and respected authority, however, which expresses a contrary view, holding that the filing and recording of the instrument which embodies the agreement is constructive notice. These authorities express the view that it is not too burdensome a task to check the chattel mortgage file where there is a possibility that fixtures on the property might be encumbered. In view of the disposition we make of this case, it is not necessary to further labor the point except to say that with respect to the proper place to file in order to protect a security interest, Minn. St. 336.9—401(1) (b) of the Uniform Commercial Code, which became effective after this litigation arose, provides:

"When the collateral is goods which at the time the security interest attaches are or are to become fixtures, then in the office of the Register of Deeds in the County where the real estate concerned is located."

Under this provision, in order to give constructive notice of a security interest in a chattel which has been attached to the realty in such manner that it appears to be a part of the realty, the lien claimant must describe the real property to which the chattel is affixed and file his financing statement in the office of the Register of Deeds in the county in which the land is located where it will be indexed as a lien against the property described.

■ It seems to us that the acts and conduct of the plaintiff throughout the whole course of this transaction are unmistakably inconsistent with its claim that its interest, derived from the conditional sales contract, is

prior and superior to the claims of the defendant insurance company derived from its real estate mortgage. We accordingly dispose of the issues presented by holding that principles of equitable estoppel preclude recovery by the plaintiff as against the mortgagee. The doctrine of equitable estoppel, which was originally expressed by this court in Dimond v. Manheim, 61 Minn. 178, 63 N. W. 495, was condensed in the more recent decision of Village of Wells v. Layne-Minnesota Co. 240 Minn. 132, 141, 60 N. W. (2d) 621, 627, in the following statement:

"Equitable estoppel arises from the conduct of a party. It includes his spoken or written words, his positive acts, and his silence or negative omission to do anything. Its foundation is justice. Its object is to prevent the inequitable assertion or enforcement of claims or rights which might have existed or have been enforceable by other rules of law unless prevented by the estoppel. Its practical effect is, from motives of equity and fair dealing, to create and vest opposing rights in the party who obtains the benefit of the estoppel. It may arise where a party remains silent when it is his duty to speak or in failing to assert a right and knowingly permitting another to act to his prejudice when the assertion of the right would have avoided the loss."

See, also, May v. Ackerman, 235 Minn. 273, 51 N. W. (2d) 87; Poksyla v. Sundholm, 259 Minn. 125, 106 N. W. (2d) 202.

Plaintiff was aware from the "Sworn Construction Statement" that the roofs were being treated as an integral part of the structure. Plaintiff acquiesced in this treatment by accepting part payment from the general contractor, by filing a mechanics lien claim for additions to the roof, and by providing the mortgagee with a waiver of mechanics lien. It can hardly be argued that the giving of the mechanics lien waiver, which acknowledged payment for the roofs as installed, was merely an empty gesture. It cannot be fairly assumed that plaintiff would in good faith represent to the mortgagee that its contributions of material and labor had been paid for and that it made no claim against the real estate and, at the same time, assert that the subject matter of its material and labor was in fact a chattel, the payment of which was secured by a conditional sales contract. We cannot escape the conclusion that the entire conduct of plaintiff was

calculated to convey to the mortgagee an impression that the facts were otherwise than it now contends. Nor can we escape the conclusion that there was at least an expectation on plaintiff's part that its acts and conduct would prompt or influence the mortgagee in entering into the mortgage. It is conceded that defendant insurance company acted in good faith and could reasonably assume from the representations made to it that plaintiff's interest was no different from that of any other supplier or subcontractor whose work and labor contributed to the total building project.

Nor does the fact that the conditional sales contract was recorded avail the plaintiff. In Dimond v. Manheim, *supra,* Mr. Justice Mitchell, in discussing prior recordation as affecting the application of principles of estoppel, said (61 Minn. 184, 63 N. W. 498):

"It has been sometimes stated that in cases of alleged estoppel by conduct affecting the title to land, if the record of the real title would furnish a means by which the other party might ascertain the truth, he cannot claim to have been misled, and cannot insist on estoppel. Speaking on the subject, Mr. Pomeroy (Eq. Jur. § 810) says: 'This conclusion, if correct at all, is correct only within very narrow limits, and must be applied with the greatest caution. It must be strictly confined to cases where the conduct creating the alleged estoppel is mere silence.' See, also, Bigelow, Estop. p. 594. There are cases where it is the duty of a person to speak or act, although the actual state of the title might be ascertained by an examination of the records. Hence all the elements of an equitable estoppel may exist, notwithstanding that the records disclose the actual state of the title; and the courts have not infrequently applied the doctrine of estoppel by conduct in such cases, even when the conduct of the party estopped consisted merely of silence and failure to assert his title. Wetzel v. Minnesota Ry. Tr. Co., supra; Conklin v. Wehrman, 38 Fed. 874; Sumner v. Seaton, 47 N. J. Eq. 103–111, 19 Atl. 884. The authorities on this question are quite exhaustively reviewed in the opinion of the vice chancellor in the case last cited."

We accordingly conclude that plaintiff should be held to the position it has assumed throughout the course of these transactions. To hold other-

wise would impose upon the mortgagee a substantial loss as the inequitable consequence of plaintiff's conduct. 28 Am. Jur. (2d) Estoppel and Waiver, §§ 35, 62, 68, and 97; 6 Dunnell, Dig. (3 ed.) §§ 3185, 3217.
Affirmed.